(No. 71516.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. PETER L. LAHR, Appellee.

*Opinion filed March 12, 1992.*

FREEMAN, J., specially concurring.
MILLER, C.J., and HEIPLE, J., dissenting.

Roland W. Burris, Attorney General, of Springfield, and Gary V. Johnson, State's Attorney, of Geneva (Rosalyn B. Kaplan, Solicitor General, and Terence M.

Madsen and Margaret O'Connell, Assistant Attorneys General, of Chicago, and Kenneth R. Boyle, William L. Browers and Cynthia N. Schneider, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

Peter L. Lahr, of Deer Park, appellee *pro se.*

JUSTICE CLARK delivered the opinion of the court:

On June 17, 1989, defendant, Peter Lahr, was driving east on Route 72 in unincorporated Kane County, approximately seven-tenths of one mile outside the village of Sleepy Hollow. At this time, Officer Beyer of the Sleepy Hollow police department was conducting stationary radar surveillance near that location. Based on a radar reading of defendant's car, Officer Beyer stopped defendant and issued a traffic citation for speeding (Ill. Rev. Stat. 1989, ch. 95½, par. 11—610(b)). At the time of the arrest, Officer Beyer was in uniform, was driving an official police vehicle and held himself out to defendant as a police officer.

Prior to trial in the circuit court of Kane County, defendant filed several *pro se* motions to strike the complaint and dismiss the charges against him. The circuit court construed these as motions to quash arrest and suppress evidence. The circuit court granted one of defendant's motions, which motion was predicated on the fact that defendant was arrested by a member of the Sleepy Hollow police department on a road located outside that municipality's boundaries. The court found that the arresting officer lacked official police authority to arrest defendant and, further, that due to the officer's use of radar surveillance outside his jurisdiction the arrest could not be legitimized by section 107—3 of the Code of Criminal Procedure of

1963 (Ill. Rev. Stat. 1989, ch. 38, par. 107—3 (arrest by private citizen)).

The appellate court, with one justice dissenting, affirmed the trial court's ruling on the motion. (207 Ill. App. 3d 419.) We granted the State's petition for leave to appeal.

At common law, municipal and county police officers had no authority to arrest a defendant outside the territorial limits of the political entity which appointed them to their office. The sole exception to this rule at common law was when the officers were in "fresh pursuit" of a suspected felon fleeing that jurisdiction. This common law rule has been modified by our appellate court's interpretation of section 107—3 of the Code of Criminal Procedure (Ill. Rev. Stat. 1989, ch. 38, par. 107—3) (arrest by private person). Section 107—3 provides:

> "Any person may arrest another when he has reasonable grounds to believe that an offense other than an ordinance violation is being committed." Ill. Rev. Stat. 1989, ch. 38, par. 107—3.

In interpreting section 107—3, our appellate court has held that a warrantless arrest made by a police officer outside of his jurisdiction may constitute a valid citizen's arrest. (See, *e.g., People v. O'Connor* (1988), 167 Ill. App. 3d 42; *People v. Gupton* (1985), 139 Ill. App. 3d 530; *People v. Rowe* (1984), 128 Ill. App. 3d 721; *People v. Marino* (1980), 80 Ill. App. 3d 657.) These cases recognize that a police officer acting outside his jurisdiction retains all the rights of an ordinary citizen, including the right to effect a citizen's arrest. (*O'Connor,* 167 Ill. App. 3d at 46; *Gupton,* 139 Ill. App. 3d at 533; *Rowe,* 128 Ill. App. 3d at 724; *Marino,* 80 Ill. App. 3d at 665.) However, these cases also recognize that when outside his jurisdiction, a police officer's right to arrest is no greater than that of a pri-

vate citizen. Therefore, an extraterritorial arrest will not be upheld if in making the arrest the officer uses the powers of his office to obtain evidence not available to private citizens. See *O'Connor,* 167 Ill. App. 3d at 46-47.

Because the State does not argue that the arresting officer had official authority to arrest defendant, the sole issue we must decide is whether the extraterritorial arrest of defendant was a valid citizen's arrest under section 107—3. The circuit court found "[t]hat, by reason of the use of radar surveillance equipment by the arresting officer herein, said arresting officer was acting within his official capacity and not as a private citizen" and, therefore, the arrest was not a valid citizen's arrest under section 107—3. Similarly, the appellate court stated "use of such [radar] equipment, in our view, taints the gathering of the information and its later use (see *O'Connor,* 167 Ill. App. 3d at 47) because the officer used the power of his office to gain access to evidence not available to private citizens." 207 Ill. App. 3d at 421.

The State argues that use of the radar gun is not an assertion of police authority because ordinary citizens may obtain and use this equipment. The State maintains that because the defendant was driving on a roadway open to plain view and because the radar equipment was available to the general public, the officer did not use the powers of his office to obtain evidence not available to a private citizen. Although it is hypothetically possible for a private citizen to obtain a radar gun and conduct his own surveillance of a road, we believe the possibility of this happening is remote. We believe it is generally true that the use of radar guns for monitoring the speed of traffic is limited to police officers. Therefore, despite the fact that this type of radar equipment is not strictly limited to police

officers, we believe its use in this case was an assertion of the officer's police authority.

Further, we believe the present case is distinguishable from our appellate court cases which have upheld the validity of extraterritorial arrests under section 107—3. In *Marino,* the Chicago police began investigating the defendant based on evidence that he was involved in an attempted burglary in Chicago. This investigation led the officers to Wood Dale, where they set up a surveillance and observed the defendant commit a burglary for which the Chicago police then arrested him. The appellate court found the arrest was a valid citizens' arrest under section 107—3, even though the officers asserted their official authority to effect the arrest. (*Marino,* 80 Ill. App. 3d at 665.) In *Marino,* the defendant did not argue that the arrest was invalid because police used the power of their office to obtain evidence not available to private citizens, but rather that the arrest was invalid because they improperly asserted the authority of their office to effect the arrest. Thus in *Marino,* the court never considered the question at issue here, namely, whether the manner in which the officers gathered the evidence was an improper assertion of police authority. Further, unlike *Marino,* in the case at bar the arresting officer was not investigating any particular person or any crime known to have been committed within Sleepy Hollow. It appears the officer was doing what many police officers do—waiting by the side of a road for speeding motorists to pass.

Similarly, this case is distinguishable from *O'Connor,* in which a Palos Park police officer parked his squad car in an unincorporated area outside his jurisdiction in order to conduct radar surveillance of a road located within Palos Park. In *O'Connor,* the offense and arrest both occurred in the officer's jurisdiction.

The court found the use of the radar equipment was not an impermissible extraterritorial assertion of police authority in large part because the road under surveillance was within the officer's jurisdiction. (*O'Connor*, 167 Ill. App. 3d at 47.) In the present case, neither the position of the radar nor the point of the offense was within the officer's jurisdiction.

In *Gupton* and *Rowe*, prior to arresting the defendants, the arresting officers first observed the cars driven by the defendants swerving from lane to lane. The officers stopped the cars for improper lane usage and upon observing the drivers arrested them for driving under the influence. After making the arrests, the officers administered breathalyzer tests in their role as police officers. The appellate court found the extraterritorial arrests were valid citizens' arrests because the officers had probable cause to arrest the defendants based on their observations of defendants' swerving cars. (*Gupton*, 139 Ill. App. 3d at 533; *Rowe*, 128 Ill. App. 3d at 724.) Because the breathalyzer tests occurred after the arrests, this assertion of police authority did not invalidate the arrests. (*Gupton*, 139 Ill. App. 3d at 534; *Rowe*, 128 Ill. App. 3d at 724.) Thus neither *Gupton* nor *Rowe* addresses the question of whether a prearrest assertion of the officer's official authority (*i.e.*, the use of the radar gun) to obtain evidence will invalidate an extraterritorial arrest. Further, despite the State's arguments to the contrary, in the instant case the record is silent as to whether the officer was able to determine that defendant was speeding without the aid of the radar.

The State also relies on *Phoenix v. State* (Fla. 1984), 455 So. 2d 1024, in which the Florida Supreme Court applied that State's "under color of office" doctrine to determine the validity of an extraterritorial arrest. The court noted that "the 'under color of office'

doctrine applies only to prevent law enforcement officials from using the powers of their office to observe unlawful activity or gain access to evidence not available to a private citizen. [Citations.]" (*Phoenix,* 455 So. 2d at 1025.) The court in *Phoenix* held that an arrest is not invalid due to the "under the color of office" doctrine merely because the officers had identified themselves as police officers at the time of the arrest. The court found the arrest in that case could be a valid citizens' arrest because the "officers had not asserted their official position for any purpose other than to make the arrests. The evidence upon which the [extraterritorial] arrests were based was obtained before confronting any persons [outside the officers' jurisdiction] and without any unlawful assertion of official authority vis-a-vis the [defendants] or a third party." *Phoenix,* 455 So. 2d at 1026.

In the present case, the State suggests that we adopt the holding of *Phoenix.* The State argues that because the officer did not confront defendant until after the evidence was already obtained, the officer did not assert the power of his office until that time. Therefore, the State contends that the holding in *Phoenix* supports the arrest. However, this argument presupposes that use of the radar in the instant case was not an assertion of authority. Thus, *Phoenix* adds little to a determination of the question of whether use of the radar was itself an assertion of the officer's official authority.

As previously stated, in this case the officer was not investigating any particular individual or suspected crime. Nor is there any evidence except the radar which indicates the officer had reasonable grounds to believe a crime had been committed. Under these circumstances, we agree with the trial court that upholding the arrest as a valid citizen's arrest under section

107—3 "would allow police authorities to establish extraterritorial radar surveillance for speeding violations in any location within this State outside of the respective police authorities' area of jurisdiction." Such a far reaching result would virtually abolish the general rule regarding an officer's power outside of his jurisdiction.

For the foregoing reasons, we affirm the decision of the appellate court.

*Appellate court affirmed.*

JUSTICE FREEMAN, specially concurring:

I concur in the holding of the majority. Officer Beyer's extraterritorial conduct did not constitute a valid citizen's arrest. I write separately to address an additional concern.

At the time of this arrest, Officer Beyer was fully cloaked in the indicia of his office as a Sleepy Hollow police officer. He was seated in his police vehicle, fully clad in his Sleepy Hollow police uniform, and had set up radar surveillance. Significantly, it appears that Officer Beyer was officially on duty, and accountable to the citizens and the police department of Sleepy Hollow at the time of this arrest.

Having determined that Officer Beyer acted beyond the scope of his authority, the State seeks to validate his improper assertion of authority as a citizen's arrest. I am troubled by this backdoor approach to proper law enforcement.

As the majority opinion points out, except in certain circumstances, police officers have no authority beyond the jurisdiction in which they are empowered to act. To so easily permit validation of an unauthorized arrest as a citizen's arrest renders the jurisdictional requirement a nullity. Taken to its logical extreme, as long as the officer's conduct can be accommodated within the scheme of a valid citizen's arrest, the officer need not

be concerned that his extraterritorial conduct is unauthorized.

At first glance, it would appear that validation of an unauthorized arrest of an offender is a result which is wholly beneficial to society. After all, the law is enforced; the offender is apprehended. Certainly, I do not discount this as an advantage. Unquestionably, my concern is not for the misfortune of the offender whose initial unauthorized apprehension is subsequently validated.

However, such a benefit is not without its costs. What of the citizens of the municipality whose protection and safety have been entrusted to the on-duty officer? The municipality has, no doubt, allocated financial resources and manpower for the protection of its citizens and the enforcement of laws within its boundaries. While the on-duty officer is servicing another jurisdiction, his own municipality is ill served. The citizenry is less protected and deprived of services which its tax dollars have funded.

Additionally, I believe that sanctioning the extraterritorial conduct of an on-duty police officer, by validating that conduct as a citizen's arrest, may have negative implications for the officer as well as for the officer's municipality. When an on-duty officer acts outside of his jurisdiction, problems are created in terms of the officer's legal responsibility and accountability. Furthermore, generally, the municipality bears responsibility for the actions of its officers who are acting within the scope of their authority. However, when the on-duty officer acts extraterritorially, the municipality must confront issues of insurance and liability beyond those which it normally faces.

In light of these considerations, other than in exceptional circumstances, such as where the officer is in fresh pursuit, I would decline to hastily validate an ex-

traterritorial arrest of an on-duty officer. A refusal to sanction such conduct deters on-duty officers from disregarding their jurisdictional constraints and responsibilities to their own municipality.

CHIEF JUSTICE MILLER, dissenting:

I do not agree with the majority's conclusion that the police officer failed to effect a valid citizen's arrest of the defendant. Accordingly, I dissent.

Section 107—3 of the Code of Criminal Procedure of 1963 permits "[a]ny person" to make an arrest when the person "has reasonable grounds to believe that an offense other than an ordinance violation is being committed." (Ill. Rev. Stat. 1989, ch. 38, par. 107—3.) The authority granted by section 107—3 is available to law enforcement officers and private citizens alike. The statute does not, however, validate every extraterritorial arrest made by a police officer. Because an officer's authority outside his jurisdiction is no greater than that possessed by a private citizen, the rule has evolved that an extraterritorial arrest is not valid under section 107—3 if it is based on evidence or other information the officer acquired through an exercise of official authority while outside his jurisdiction. 147 Ill. 2d at 382-83; *People v. O'Connor* (1988), 167 Ill. App. 3d 42, 46-47; see also *United States v. Hernandez* (11th Cir. 1983), 715 F.2d 548, 551; *Phoenix v. State* (Fla. 1984), 455 So. 2d 1024, 1025-26.

Assuming the correctness of what has been termed the "under color of office" limitation, I would not find it implicated in the present case. Here, the use of the radar device involved no assertion of official authority and provided the officer with no advantage that could not also be enjoyed by a member of the general public. That private citizens rarely use radar guns to monitor traffic, as the majority asserts in invalidating the

defendant's arrest, misconstrues the scope of the "under color of office" restriction; properly applied, that rule is triggered only by an assertion or exercise of authority, and not simply by conduct having a causal connection to the arresting officer's employment. In any event, I would note that the defendant in this case was traveling 80 miles per hour in a zone with a speed limit of 50, a violation that must have been apparent to even the casual observer.

The unwelcome result of today's decision is to unnecessarily curtail the statutory authority of an officer to make an arrest outside his jurisdiction. Under the majority's reasoning, a private citizen who uses a radar gun to detect a speeding motorist will be permitted by statute to arrest the driver, but a police officer who, outside his jurisdiction, employs the same lawful means of monitoring traffic cannot make an arrest. In these circumstances, the authority of a police officer under section 107—3 should be no less than that possessed by a private citizen. For the reasons stated, I respectfully dissent.

JUSTICE HEIPLE, also dissenting:

On June 17, 1989, all was quiet in the Village of Sleepy Hollow. The village policeman, Officer Beyer, having nothing better to do, decided to expand his area of law enforcement. Officer Beyer, on duty and in uniform, took the police car and the police radar gun and located himself along Route 72 at a point seven-tenths of a mile outside the village limits. It was in that posture and at that location that Officer Beyer clocked and arrested the defendant, Peter Lahr, for driving 80 miles per hour in a 50 mile-per-hour zone.

The defendant moved to quash the arrest and suppress the evidence on the grounds that the arrest was extraterritorial and thus illegal. There is no dispute that

the jurisdiction of a police officer is limited to the geographical limits of the governmental unit where the police officer is employed. (*People v. Marino* (1980), 80 Ill. App. 3d 657, 661.) However, the State claims that the officer had the right to make a "citizen's arrest." That is to say, Officer Beyer had the same right as any other citizen of the State to arrest a person on the spot who is observed to be committing an offense. Ill. Rev. Stat. 1989, ch. 38, par. 107—3.

The trial judge granted defendant's motion. The State appealed and the appellate court, with one judge dissenting, affirmed. (207 Ill. App. 3d 419.) The majority opinion of this court also affirms. I respectfully dissent.

In its simplest terms, this case stands for the proposition that an on-duty traffic policeman with a radar gun may not ply his trade outside the geographic area of his local unit of government. If that were all there were to it, the proposition might be viewed as a humane and beneficent rule of law by the numberless Illinois motorists who operate their motor vehicles under the constant concern of being arrested for speeding. Most motorists would probably applaud a rule that limits and restricts overreaching on the part of traffic policemen. That this ruling will put a noticeable crimp in traffic enforcement or traffic safety is, however, certainly not the case. So far as policemen are concerned, Illinois is covered like a blanket. In addition to Illinois' 2,100 State policemen,[1] there are 102 counties with

---

[1]Telephone interview with Illinois State Police, Division of Administration (Feb. 5, 1992). (James Milbrandt, bureau chief of the Management and Information Bureau, Illinois State Police, estimates that with 2,100 State policemen, approximately 400,000 motor vehicle citations will be issued per year. Out of this number, a little more than half will be for speeding violations. In 1990, 203,830 speeding tickets were issued by State policemen.)

sheriff's departments, 1,281 cities and villages authorized to have municipal police departments[2] plus 355 park districts with police powers.[3] Chicago alone has over 12,000 police officers.[4] Peoria, much smaller, has over 200.[5] While State policemen will continue to have statewide jurisdiction, the announced rule will keep municipal policemen and sheriff's deputies within their own narrow geographical areas.

Parenthetically, I would also note that while the original purpose of enacting and enforcing highway speed laws was public safety, this purpose has, in substantial measure, given way to the purposes of earning bounty revenues for State and local governments and of furnishing employment to hundreds of policemen. In Illinois as a whole, these predatory activities produce annual revenue in fines and costs approximating $75 million.[6]

---

[2]Telephone interview with Illinois Municipal League (Feb. 5, 1992).

[3]Illinois Association of Park Districts, Illinois Park and Recreation Professional & Agency Directory (1991-92).

[4]Bureau of Identification, Illinois State Police, Crime in Illinois (1990).

[5]Bureau of Identification, Illinois State Police, Crime in Illinois (1990).

[6]Telephone interview with Jack Goggin, chief deputy clerk, office of the circuit clerk of Cook County, Aurelia Pucinski, clerk (Feb. 7, 1992). (Revenue from traffic fines and costs for the year 1990 for Municipal District 1 of the Cook County courts (City of Chicago) amounted to $18,159,000. While consolidated figures are not available for the State as a whole, extrapolation of the Chicago figures, as estimated by Judge Wayne R. Anderson, formerly supervising judge of the traffic center of Municipal District 1 of the circuit court of Cook County, now United States district judge, Northern District of Illinois, indicate State revenue from traffic fines and costs of approximately $75 million.)

But to get back to the case at hand, the question before the court is not whether a police officer should have extraterritorial jurisdiction. I agree with the majority and with that long line of cases that says he should not. Where I depart from the majority is in its ruling that reduces the arrest powers of a police officer below that of an ordinary citizen.

How does the majority arrive at its conclusion? It does so by grounding its decision on the use of the radar gun, stating that its use was "an assertion of the officer's police authority" in an area outside of his territorial jurisdiction. (147 Ill. 2d at 384.) Citing the Illinois appellate opinion of *People v. O'Connor* (1988), 167 Ill. App. 3d 42, the majority states that "an extraterritorial arrest will not be upheld if in making the arrest the officer uses the powers of his office to obtain evidence not available to private citizens." (147 Ill. 2d at 383; see *O'Connor*, 167 Ill. App. 3d at 46-47.) The majority then reasons that since "it is generally true that the use of radar guns for monitoring the speed of traffic is limited to police officers," the use of a radar gun in this case was an impermissible assertion of police authority. (147 Ill. 2d at 383-84.) The appellate court's reliance upon *O'Connor* is quoted with approval for the proposition that "use of such [radar] equipment *** taints the gathering of the information and its later use [citation] because the officer used the power of his office to gain access to evidence not available to private citizens." 147 Ill. 2d at 383.

The majority opinion finds no difficulty with the fact that the police officer was on duty, in uniform and using a police vehicle at the time of arrest. Those attributes of officialdom are not viewed by the majority as impermissible assertions of police authority. Were they so viewed, the majority opinion would be unable to reconcile the otherwise inconsistent cases of *People*

*v. Marino* (1980), 80 Ill. App. 3d 657, *People v. Gupton* (1985), 139 Ill. App. 3d 530, *People v. Rowe* (1984), 128 Ill. App. 3d 721, and even *O'Connor*, 167 Ill. App. 3d 42, which the majority both approves and distinguishes. In order to reach its conclusion in the instant case, the majority opines that *the use of police authority to gather evidence* is what taints a later arrest. And that, since the use of a radar gun amounts to the assertion of police authority, the arrest flowing therefrom is thus "tainted" and illegal.

Initially, it should be noted that the majority opinion proceeds from a bad premise. The use of police authority to gather evidence does not "taint" an arrest. The use of police authority to gather evidence is wholly appropriate and, in fact, a fundamental part of the police function. It should be of no moment whether a police officer gathers evidence either within or without his jurisdiction. Evidence gathering has no geographical boundaries. A ruling to the contrary serves no useful societal purpose and, indeed, serves instead to impede law enforcement. Such a rule should not be followed.

The implications of this rule are serious indeed. If a municipal policeman, in the exercise of his police authority, acquired evidence of a crime being either committed or planned, he would be unable to intercept and arrest the culprit in the act of commission of the offense if the situs were outside the boundaries of the municipality. In intercepting an armed robbery or even a murder in progress, the policeman's arrest would be quashed and the evidence would be suppressed under the rationale promulgated by the majority opinion. A private citizen, incongruously, would not be so restricted and could, if so inclined, effectuate the arrest of the armed robber or murderer.

The majority, relying upon *O'Connor*, 167 Ill. App. 3d 42, reasons that since a police officer's authority to

make an extraterritorial arrest is no greater than that of a private citizen, the evidence gathered which forms a basis for the arrest must also be available to a private citizen. The appellate court in *O'Connor*, and the majority in the instant case, fail to realize that the admissibility of evidence and the validity of an arrest are two separate and distinct issues. In order for a police officer's extraterritorial arrest to be valid, it must fall within the scope of section 107—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 107—3). The evidence upon which the arrest is based, however, may be obtained through any and all legal means available to the police officer.

The *O'Connor* court relied primarily upon Florida law in reaching its conclusion. The Florida Appellate and Supreme Courts have created a doctrine referred to as "under color of office." Under the "under color of office" doctrine, "officers who act outside their jurisdiction, but not in fresh pursuit, may investigate and gather evidence only through the use of their own senses and through the voluntary cooperation of citizens; they may not employ the power or color of their office either expressly or by implication in order to gather evidence or ferret out criminal activity not otherwise observable." (*State v. Phoenix* (Fla. App. 1982), 428 So. 2d 262, 266 n.2.) This doctrine, which the majority accepts by implication, unnecessarily limits the evidence-gathering capability of a police officer outside his jurisdiction and has potentially wide and dire implications for law enforcement. A police officer should be allowed to gather evidence through any and all legal methods at his disposal and base a "citizen's arrest" upon this evidence.

Finally, I disagree with the majority's conclusion that it is the use of a radar gun by a police officer outside of his geographical jurisdiction which invalidates

and taints an otherwise valid citizen's arrest. Radar guns are available to the general public. Any citizen may buy and use one. Thus, if a private citizen had engaged in the same method of surveillance as Officer Beyer and made a citizen's arrest, the arrest would be legal and upheld under Illinois law. The majority opinion does not dispute that proposition. The fact that most citizens do not possess radar guns is of no import. If Officer Beyer had utilized a stopwatch or a wristwatch to clock the defendant rather than using a radar gun, would the majority be able to assert that the use of a stopwatch or a wristwatch was an impermissible assertion of police authority? It is not likely. However, a radar gun is merely a mechanical device to measure speed. A stopwatch or wristwatch, also mechanical devices, can be applied to the same ends.

With all due respect, the initial premise of the majority opinion is grounded on Florida quicksand and nothing else. A survey of other jurisdictions discloses no support for the so-called "color of office" doctrine which would prevent law enforcement officials from using the powers of their office to gather evidence. Beyond that, the ratiocination by which the majority reaches its ultimate conclusion is difficult to follow. The seizure upon the radar gun as a unique instrumentally of police authority is factually incorrect since radar guns are available for purchase and use by private citizens without restriction. Moreover, as the radar gun is a mere timing device, it deserves no special status above that of a stopwatch or wristwatch, also mechanical devices which are available to all citizens. The singling out of the radar gun is thus an artificial and legalistic distinction. Finally, it seems incongruous to reduce a police officer's power of arrest below that of a mere citizen.

Other than an unexpressed annoyance with police speed traps, which most fair-minded citizens resent, the basis for the majority's decision is difficult to understand. The appellate court below, however, expressed the fear that a contrary ruling "would allow a municipality to carry out radar surveillance almost anywhere in the State." (207 Ill. App. 3d at 421.) Certainly, few would welcome the specter of roving village policemen setting up speed traps all over the State. So far as I am informed, however, that situation has not occurred, at least to any observable extent. Should it occur, however, and should it prove to be an annoyance to the motoring public, the General Assembly could easily remedy that intrusion with a short and simple amendment to either the criminal code or the motor vehicle code. The point here is that the perceived potential problem is legislative and not judicial.

For the reasons given, I respectfully dissent from the decision of the court.