# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Contreras, 2011 IL App (2d) 100930**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JAVIER CONTRERAS, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-10-0930 |
| Filed | December 15, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for delivery of cocaine and controlled substance trafficking, the trial court properly suppressed evidence obtained on the ground that the Chicago police officers who stopped and arrested defendant in Will County based on an offense that occurred in Du Page County lacked the authority to act extrajudicially, since the officers only had second-hand awareness of the commission of a felony in which they had a suspicion defendant participated and section 107-4(a-3)(2) of the Code of Criminal Procedure required that they have first-hand awareness. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 09-CF-2641; the Hon. George J. Bakalis, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Joseph E. Birkett, State's Attorney, of Wheaton (Lisa Anne Hoffman, Assistant State's Attorney, and Lawrence M. Bauer and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | Barry A. Spector, of Barry A. Spector & Associates, of Evanston, for appellee. |
| Panel | JUSTICE BOWMAN delivered the judgment of the court, with opinion. Presiding Justice Jorgensen and Justice Zenoff concurred in the judgment and opinion. |

## OPINION

¶ 1    The State appeals from a ruling suppressing certain evidence against defendant, Javier Contreras. The suppression was the result of a ruling that Chicago police officers had stopped and then arrested defendant in Will County in relation to an offense that took place in Du Page County, when the officers lacked authority to act extraterritorially. The State contends that, under section 107-4(a-3)(2) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/107-4(a-3)(2) (West 2008)), the officers' second-hand awareness of the recent commission of a felony in which they had reasonable suspicion that defendant participated gave them authority to stop defendant. We hold that section 107-4(a-3)(2) requires first-hand awareness, which the officers did not have.

¶ 2    The State further argues that, even if the extraterritorial stop and arrest were improper, the court erred in suppressing the evidence. However, it concedes that binding supreme court precedent requires suppression for such violations, and it admits that it makes the argument solely to preserve it. We agree that binding precedent holds "that the exclusionary rule is applicable where the police effectuate an extraterritorial arrest without appropriate statutory authority." *People v. Carrera*, 203 Ill. 2d 1, 11 (2002). We therefore affirm the suppression.

¶ 3                    I. BACKGROUND

¶ 4    Defendant was charged with delivery of 900 or more grams of cocaine (720 ILCS 570/401(a)(2)(D) (West 2008)) and controlled substance trafficking of the same 900 or more grams of cocaine (720 ILCS 570/401.1(a) (West 2008)).

¶ 5    Defendant filed four suppression motions. Only the fourth is at issue here, but the parties stipulated that the evidence educed for the first three would also be used for the fourth. In the first, defendant moved to suppress a confession based on alleged flaws under the rule in

-2-

*Miranda v. Arizona*, 384 U.S. 436 (1966). In the second, he moved to suppress evidence (including $4,000 in cash) that was the product of his stop and the ensuing search, arguing that the stop had been without sufficient basis. In the third, he moved to quash his arrest and suppress all evidence resulting from it, again arguing that the police had lacked sufficient basis to stop defendant. The court held one evidentiary hearing on all three motions.

¶ 6 The principal witness at the hearing was Officer Brian Luce of the Chicago police. He testified that he and the Chicago police narcotics group that he was working with had identified one Mario Arellano as a person probably engaged in "smurfing" for a large-scale Chicago narcotics operation. ("Smurfing"–which, in this sense, is also known as "structuring"–is a way to evade having financial institutions file currency transaction reports or suspicious activity reports. A transaction, which, if made in one step, would trigger a report, is structured into a number of smaller transactions designed to avoid suspicion. See Black's Law Dictionary 1423 (8th ed. 2004). Luce and his team observed Arellano making many visits to currency exchanges.)

¶ 7 The group began surveillance of Arellano on September 28, 2009. The surveillance identified vehicles and addresses that group members concluded were associated with the narcotics operation. The vehicles included a BMW, a gray pickup, and Arellano's van. The addresses were a house at 359 Sweet Gum Street in Bolingbrook, a house at 1114 Janet Street in Darien (at which the BMW and the pickup were registered), and a house at 7701 Clarendon Hills Road in Willowbrook (which was Arellano's residence).

¶ 8 At the time of defendant's arrest, surveillance of Arellano associate Eduardo Torres had resulted in "recovery of over 4,000 grams of cocaine." This was on October 13, 2009, and resulted in the arrest of another suspect. Luce and his group were not aware of defendant until October 21, 2009.

¶ 9 On that day, the movement of the suspects appeared to the surveillance team to focus on the property at 1114 Janet Street. Luce described this property as a residence on a lot with a high fence and a gate across the driveway. The BMW arrived on the premises and then left. A minivan with forged registration stopped at the property and then went to 359 Sweet Gum Street. The minivan driver employed countersurveillance driving patterns. The BMW returned to 1114 Janet Street. The officers then saw that the tractor portion of a semi-trailer rig–which we will refer to as a truck–was parked behind the house. The surveillance saw somebody go from the truck into the house. Eventually, Arellano's van and the BMW both were driven away. Shortly thereafter, the truck also left. Luce and his colleagues believed that the truck was the likely conveyance for a large-scale narcotics shipment, so Luce and another officer, Luis Garza, followed it.

¶ 10 While Garza and Luce were following the truck, other officers, led by Officer Morovic, followed the BMW to 7701 Clarendon Hills Road, where they saw it pulling into the garage. (The house at 7701 Clarendon Hills Road was a two- or three-minute drive from 1114 Janet Street in Darien.) Somewhat later, the officers at 7701 Clarendon Hills Road saw Arellano exiting the house carrying a plastic bag with two "squared-off objects" in it, which the officers believed were two packages of cocaine in kilogram-sized bricks. Morovic announced himself to Arellano as a police officer and Arellano threw down the bag. The officers

recovered it; the contents were as expected and a field test was positive for cocaine. Morovic used a secure cell-based communications channel to tell other team members that Arellano had been carrying cocaine.

¶ 11    Meanwhile, Luce and Garza followed the truck to a Bolingbrook truck stop. Defendant was the driver. At the truck stop, defendant backed the truck up to a trailer. He and Jose Contreras (elsewhere identified as defendant's son) went to "the rear," then got back up into the truck's cab. At that point, Luce had already heard Morovic's account of the stop of Arellano; Luce then learned that a search of Arellano had found some cocaine in Arellano's pocket. Garza and Luce had separate vehicles, which they pulled up alongside the truck such that it could not be driven away. Luce, with his badge on display, got up onto the step to the truck cab and asked defendant to step out. Defendant did so, but Luce saw that he reached toward the rear of the cab before doing so. When defendant got out, he was shaking and sweating. Luce admitted that, when he approached defendant, he did not know defendant's name and lacked certainty of defendant's role in the narcotics operation.

¶ 12    Luce announced that he was engaged in a narcotics investigation and asked defendant where he had come from. Defendant said that he had come from a restaurant. Luce said that defendant was lying; he had come from a residence. Luce asked defendant to consent to a search of the truck. Defendant signed a Chicago police consent-to-search form. Luce then made a request to the Bolingbrook police department for a drug dog. An officer arrived with the dog. It did not alert in the trailer, but it did in the rear of the cab. Luce searched in that area and found $2,000 in cash. After Luce found the money, defendant told Luce that he had brought $40,000 in cash from California. He took $2,000 in cash from his pants pocket, saying that it was partial payment for moving the $40,000. Garza took defendant into custody, and Luce went to join a team searching the house at 7701 Clarendon Hills Road.

¶ 13    Garza testified about his participation in defendant's arrest, particularly his reading defendant his *Miranda* rights.

¶ 14    The court denied the motions in a memorandum decision that included detailed findings of fact. Those findings are consistent with our summary of the evidence. The court held that, although all of defendant's acts had possible innocent explanations, the police could reasonably infer that the truck had been used to make a delivery of cocaine to 1114 Janet Street, that the BMW carried the cocaine to 7701 Clarendon Hills Road, and that that was why Arellano was carrying the cocaine just before he was arrested. This, the court concluded, gave Luce a reasonable and articulable suspicion that the truck had been involved in criminal activity. The court called the matter a "close case," but said that the original detention of defendant was proper as a stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and that the ensuing search was voluntary.

¶ 15    Defendant then filed his fourth suppression motion. He asserted that Luce and Garza had violated statutory limits on extraterritorial actions by law enforcement officers when they stopped defendant. He asked the court to quash his arrest and to suppress his statements and the evidence seized.

¶ 16    The parties agreed that another evidentiary hearing was unnecessary. Defendant asked the court to take judicial notice that Darien is in Du Page County and does not adjoin

-4-

Chicago, that Willowbrook is in Du Page County and does not adjoin Chicago, and that Bolingbrook is in Will County and does not adjoin Chicago. See 65 ILCS 5/7-4-7 (West 2008) ("The territory which is embraced within the corporate limits of adjoining municipalities within any county in this State shall be a police district."); 65 ILCS 5/7-4-8 (West 2008) ("The police of any municipality in such a police district have full authority and power as peace officers and may go into any part of the district to exercise that authority and power.").

¶ 17    Defense counsel argued that the State had presented no evidence that the Chicago police were investigating an offense that occurred in Chicago. He further argued that Luce and Garza were not personally aware of defendant's having committed any felony or misdemeanor in the state. He pointed out that the court had already ruled that Luce and Garza had not had probable cause to arrest defendant when they initially stopped him. Finally, he contended that, based on the use of police powers, the stop was not proper as an arrest by a private person.

¶ 18    The State responded that the officers were personally aware of defendant's commission of a felony, based on his presence with his truck at 1114 Janet Street and based on Arellano's being arrested with cocaine. Alternatively, it argued that, based on the evidence that Arellano was smurfing, the police were engaged in the investigation of an offense that took place in Chicago.

¶ 19    The court ruled that the *Terry* stop of defendant was improper and that defendant's statements to the police and other evidence were fruits of that improper stop. It ruled that the facts were as set out in the earlier decision. The court reasoned that either of two provisions was a potential source of authority for the *Terry* stop of defendant: (1) section 107-4(a-3) of the Code (725 ILCS 5/107-4(a-3) (West 2008)), which allows law enforcement officers to make *Terry* stops and arrests in specified circumstances, and section 107-3 of the Code (725 ILCS 5/107-3 (West 2008)), which allows *any* person to make arrests for offenses other than ordinance violations. Within section 107-4(a-3), it deemed section 107-4(a-3)(1) (725 ILCS 5/107-4(a-3)(1) (West 2008)) and section 107-4(a-3)(2) to be the only provisions that might authorize the officers' actions. Section 107-4(a-3)(1) allows arrests or *Terry* stops "if the officer is engaged in the investigation of an offense that occurred in the officer's primary jurisdiction and the temporary questioning is conducted or the arrest is made pursuant to that investigation." 725 ILCS 5/107-4(a-3)(1) (West 2008). Section 107-4(a-3)(2) allows arrests or *Terry* stops "if the officer, while on duty as a peace officer, becomes personally aware of the immediate commission of a felony or misdemeanor violation of the laws of this State." 725 ILCS 5/107-4(a-3)(2) (West 2008).

¶ 20    As to section 107-3, the court noted that Illinois courts have held that, when law enforcement officers have used police powers to garner the information needed to make an arrest, section 107-3 does not provide them authority to make the arrest. It ruled that the officers' use of a communications channel limited to the police was a use of police powers; section 107-3 therefore did not provide authority for the stop.

¶ 21    It further ruled that section 107-4(a-3) did not provide authority for the stop either. It found that section 107-4(a-3)(1) was unavailable because the offense at issue occurred in

Du Page County, not in Chicago.

¶ 22 Finally, it ruled that section 107-4(a-3)(2) also did not apply:

"Here an argument can be made the [*sic*] Officer Luce became aware of the commission of a felony or misdemeanor by Mario Arellano. This was when Arellano was stopped in Willowbrook with evidence of possession of Cocaine. This information was conveyed to Officer Luce but was not personally observed by him. In other settings information one police officer may have can be imputed to the knowledge of other officers. The court, however, does not believe that this is the intent of this subsection. Even under Section 107-3 which allows arrest by a private citizen based on reasonable grounds to believe a crime has been committed, cases interpreting citizen's type arrest by police have stressed that the officer making the citizen[']s arrest had made personal observations to establish reasonable grounds. [Citation.] Section 107-4(a-3)(2) requires the officer to become personally aware of the immediate commission of the offense. This implies that the officer may make an arrest as a peace officer outside of his jurisdiction when he personally observes an offense being committed. ***

Here Chicago Police certainly had not observed the defendant committing any offense and as previously held by the court had no probable cause to arrest the defendant at the time of his initial detention. To allow temporary questioning outside of their jurisdiction the court believes the peace officers under (2), needed to have personally observed the defendant commit an offense. Even if the court were to assume that the Chicago Police Officers['] knowledge of Arellano's arrest provided a basis under this section for detaining the defendant for purposes of 107-14 [(725 ILCS 5/107-14 (West 2008) (codifying the power to make a *Terry* stop))], that section limits the detention to the purpose of getting the name and address of the person and an explanation of his actions. In this case the Chicago Police went much further, they obtained the defendant's name and address but they did not ask for an explanation of his actions but told him they were involved in a narcotics investigation, and that he was part of it. They then proceeded to obtain a consent to search form for his vehicle and called in a canine unit to conduct the search."

¶ 23 The State filed a motion for reconsideration. It first argued that the police did not use police powers in making the stop. It asserted that defendant had failed to supply sufficient evidence that a citizen would not be able to monitor the police cell phone discussion. Further, it argued that a group of citizens could have conducted the same surveillance as the police.

¶ 24 It next argued that the officers did not need to have personally observed Arellano committing an offense. It argued that it was sufficient that Luce and Garza were personally aware of the other officers' statements about the drugs found with Arellano. It further argued that Luce's reasonable suspicion of defendant based on the conveyed information was sufficient.

¶ 25 In other sections of the motion, the State argued that suppression was not the appropriate remedy for an extraterritoriality violation and that, even if it sometimes was, the doctrine of attenuation made it inappropriate when the confession that defendant sought to suppress had come many hours later.

-6-

¶ 26 Defendant replied. He asserted, among other things, that section 107-4(a-3)(2) could apply only if the officers were personally aware of a felony or misdemeanor *committed by defendant*. He also argued that the requirement that the officers be personally aware of the commission of an offense should be read to require the officers to have first-hand knowledge of the offense's commission.

¶ 27 At the hearing, the State explained that its position was that, under section 107-4(a-3)(2), the officers needed knowledge only that *some* crime had been committed and reasonable suspicion that defendant had committed a crime. The court and the parties then began to consider whether defendant's confession should be deemed sufficiently attenuated from the stop that a flaw in the stop would not necessitate suppression of the confession.

¶ 28 The court said that it had struggled with the interpretation of "personally aware" as used in the statute, but had concluded that personal observation was required. The court denied the motion as to the extraterritoriality issue, but said that it would need more facts to decide whether the confession was sufficiently attenuated from the stop that suppression was not required. (The hearing on attenuation would not affect the inadmissibility of the evidence that the police gained promptly from the stop and search.) It set a hearing for that issue a month later. The State then appealed, filing a certificate of impairment.

¶ 29                                    II. ANALYSIS

¶ 30 On appeal, the State makes two arguments. First, it asserts that section 107-4(a-3)(2) does not require officers to have "personally observed" the commission of an offense before they make any stops or arrests under the section. It argues that, because the dictionary definition of "aware" is " 'knowing; realizing; conscious,' " "personally aware," as used in the statute, means only "knowing; realizing; conscious." It does not suggest that either section 107-4(a-3)(1) or section 107-3 authorized the stop of defendant by Luce and Garza. Second, the State argues that the exclusionary rule should not apply to violations of the rules for extraterritorial stops and arrests by law enforcement officers. However, it concedes that it makes this argument solely to preserve it for supreme court review. We deem the State's first argument unpersuasive as statutory interpretation. We do not address the second argument, as the State concedes that we are bound by contrary precedent.

¶ 31 In reviewing a court's ruling on a motion to suppress, we "accord great deference to the trial court's factual findings," reversing them only if they are against the manifest weight of the evidence. *People v. Close*, 238 Ill. 2d 497, 504 (2010). However, we "review *de novo* the court's ultimate decision to grant or deny the motion." *Close*, 238 Ill. 2d at 504. Here, neither the State nor defendant questions the court's findings of fact, so our review is effectively *de novo*.

¶ 32 At issue here is the nature of awareness of an offense that section 107-4(a-3)(2) requires. What does to be "personally aware" mean here? Section 107-4(a-3)(2) in full provides:

"Any peace officer employed by a law enforcement agency of this State may conduct temporary questioning pursuant to Section 107-14 of this Code [codifying the rule in *Terry*] and may make arrests in any jurisdiction within this State *** if the officer, while on duty as a peace officer, becomes personally aware of the immediate commission of

a felony or misdemeanor violation of the laws of this State[.]" 725 ILCS 5/107-4(a-3) (West 2008).

We conclude that, in this context, being "personally aware" means having first-hand awareness or knowledge.

¶ 33     "The cardinal rule of statutory interpretation, to which all other rules are subordinate, is to ascertain and give effect to the intent of the legislature." *People v. Maggette*, 195 Ill. 2d 336, 348 (2001). When determining the legislature's intent, a court must first look to the language of the statute itself. *Maggette*, 195 Ill. 2d at 348. "Where the statutory language is clear, it will be given effect without resort to other interpretative aids." *Maggette*, 195 Ill. 2d at 348. Where the language is unclear, use of rules of statutory construction is appropriate. See *Maggette*, 195 Ill. 2d at 349-50 (applying such rules to an ambiguous provision). Of those rules, one that we deem particularly applicable here is that a "court should construe a statute, if possible, so that no term is rendered superfluous or meaningless." *Maggette*, 195 Ill. 2d at 350.

¶ 34     We think that the most useful starting point is a consideration of the meaning here of "personal." For one possible meaning of "personal," its antonym is "impersonal"–taken here not in the sense of distant or unfriendly, but in the sense of not relating to a person. If that were the applicable meaning of "personal," a peace officer would then *not* be permitted to make stops or arrests if he or she became *impersonally* aware of the immediate commission of an offense. Although the question of whether impersonal awareness can ever exist may make for a good metaphysical debate, in normal contexts, for that meaning of "personal," being "personally aware" is the same thing as being "aware." Because this sense of "personally" adds nothing to the provision, it is not a favored interpretation. Several other meanings of "personal," such as "relating to one's private affairs," make even less sense here. One meaning does make sense and adds meaning to the provision: the one in use in phrases like "I'll handle it personally." In this sense, "personally" implies acting oneself, and not through another. "Direct," "first-hand," and "without aid of another" all are reasonable synonyms for "personally" in this sense. We conclude that the section uses "personally" in this sense.

¶ 35     To read section 107-4(a-3)(2) as requiring first-hand awareness of the commission of an offense comports with the overall impression that the section gives. The legislature wanted peace officers out of their own jurisdictions to be free to act should they find themselves faced with a newly committed crime. This overall meaning is further confirmed by the section's reference to the *immediate* commission of an offense.

¶ 36     The State argues that, if the legislature intended to require officers to have "personally observed" the commission of an offense, it could have said so. That form of argument works equally well against nearly any interpretation of a vague or ambiguous provision and thus does not aid interpretation. If the legislature intended to grant a peace officer acting extraterritorially authority to stop or arrest based on non-first-hand awareness of the immediate commission of an offense, it could have omitted the "personally" before aware.

¶ 37     In its reply brief, the State argues that, if section 107-4(a-3)(2) requires "personal observation," it would add nothing to the authority available to any person under section 107-

3. This is incorrect. Section 107-3 provides that "[a]ny person may arrest another when he has reasonable grounds to believe that an offense other than an ordinance violation is being committed." 725 ILCS 5/107-3 (West 2008). "The statutory phrase 'reasonable grounds' has the same substantive meaning as 'probable cause.' " People v. Lee, 214 Ill. 2d 476, 484 (2005). Thus, section 107-3 does not give a person authority to stop another on less than probable cause. Section 107-4(a-3)(2) allows *Terry* stops, and, "[u]nder *Terry* ***, a police officer who lacks probable cause for an arrest may nonetheless effect a limited investigatory stop where there exists a reasonable suspicion, based upon specific and articulable facts, that the person detained has committed *** a crime." *People v. Neuberger*, 2011 IL App (2d) 100379, ¶ 6. A peace officer may have first-hand awareness of the immediate commission of a crime, yet may lack probable cause to arrest any particular person. Section 107-4(a-3)(2) allows *Terry* stops in such circumstances.

¶ 38        Moreover, it is at least possible that section 107-4(a-3)(2) gives peace officers authority to make arrests that they would not have if only section 107-3 existed. As the trial court recognized, an arrest under section 107-3 is not proper "if in making the arrest the officer uses the powers of his office to obtain evidence not available to private citizens." *People v. Lahr*, 147 Ill. 2d 379, 383 (1992). (Such evidence includes that obtained by the use of a radar gun. *Lahr*, 147 Ill. 2d at 383-84.) Could such evidence give an officer personal–first-hand–awareness of the immediate commission of an offense? Awareness of the commission of an offense obtained by an officer's hearing the commission of a crime over a secure police channel could well fit that description.

¶ 39        Here, Luce and Garza lacked first-hand awareness of the commission of any offense. Until the other officers stopped Arellano after he threw down the plastic bag containing squared-off bundles, there existed only generalized suspicion that some offense had occurred. Luce and Garza's awareness of that event was second-hand only. They thus lacked authority under section 107-4(a-3)(2) to conduct a *Terry* stop of defendant. The court thus did not err in ruling that the stop was improper and was a basis for suppressing evidence directly derived from the stop.

¶ 40                                    III. CONCLUSION
¶ 41        For the reasons stated, we affirm the order of the circuit court of Du Page County suppressing certain evidence against defendant.


¶ 42        Affirmed.