NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180074-U

NO. 4-18-0074

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 1, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Livingston County |
| JORDAN SCRUGGS, | ) | No. 15CF304 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer Hartmann Bauknecht, |
| | ) | Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Knecht and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not err when it denied defendant's motion to quash arrest and suppress evidence where the police officer was within his authority to effectuate a traffic stop and the stop was not unreasonably prolonged.

¶ 2    After a stipulated bench trial, defendant, Jordan Scruggs, was convicted of unlawful possession of a controlled substance and unlawful possession of cannabis. Prior to trial, defendant filed a motion to quash arrest and suppress evidence, which the trial court denied. Defendant appeals and assigns error to the court's ruling on his motion to suppress. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On October 26, 2015, the State filed a three-count information, charging defendant with the following offenses: (1) unlawful possession of a schedule IV controlled substance, namely clonazepam (720 ILCS 570/402(c) (West 2014)) (count I); (2) unlawful possession of between 10 grams and 30 grams of cannabis (720 ILCS 550/4(c) (West 2014)) (count II); and (3) unlawful

possession of drug paraphernalia, namely a smoking pipe (720 ILCS 600/3.5(a) (West 2014)) (count III). These offenses were the result of a traffic stop of a vehicle driven by Keaton Longest effectuated during the early morning hours of October 25, 2015, defendant's eighteenth birthday. Defendant was the front seat passenger in the vehicle.

¶ 5        On March 28, 2016, defendant filed his motion to suppress, claiming his fourth amendment rights were violated because (1) the officer had no reason to believe an offense, neither a traffic nor a criminal offense, had been or was being committed, (2) the officer unreasonably prolonged the traffic stop, and (3) the officer was outside his territorial jurisdiction. On May 17, 2016, the trial court conducted a hearing on defendant's motion.

¶ 6        Mark Travis, a Fairbury police sergeant, testified he was patrolling the area during the early morning hours of October 25, 2015. He explained that the Fairbury Police Department patrols both the City of Fairbury and the Village of Forrest. The municipalities are approximately five miles apart along U.S. Highway 24. Sergeant Travis testified that, at approximately 3:40 a.m., he was finishing his patrol of Fairbury and intending to travel to Forrest when he observed a vehicle heading east toward Forrest. He paced the vehicle at 66 miles per hour in a 55-mile-per-hour speed zone for two or three miles. The vehicle travelled through Forrest without Travis noticing any violations. The vehicle picked up speed again to approximately 60 miles per hour after leaving Forrest. After travelling some distance beyond the village limits, Travis activated his emergency lights to initiate a traffic stop.

¶ 7        On direct examination by defense counsel, the following exchange occurred:

"Q. What were you doing in the squad before you went up to the car?

A. The nature of the stop, I was suspicious of the vehicle so—

Q. Let me stop you. What were you suspicious of other than it may have been speeding slightly?

A. Well, of the probable cause that I had and in my line of work, I approach every traffic stop very suspicious. So, I don't, I try not to rush anything so instead of just jumping right out of the car and going up to it.

* * *

I was just taking my time. That's all.

* * *

Q. So, I mean, what were you thinking? What were you doing?

A. Yeah. My PC [(probable cause)] was indicative of somebody who had been drinking and driving.

Q. Because they were speeding?

A. And they were weaving within their lane.

Q. Well, you hadn't told us about that. Are we going to see that on video?

A. Yes. That's why I activated my—normally the in-car camera does not activate until once you flip on your lights it goes back two minutes and starts. But I knew, as soon as I saw that action from that vehicle I went ahead and manually started the recording so it could catch that on there."

¶ 8    Travis testified he received identification from the driver and defendant. Defendant had an Indiana driver's license. Travis ran both licenses through his mobile data computer. Finding no outstanding warrants or other problems, Travis decided to issue a warning ticket for speeding to the driver. He asked the driver to step out of the car and directed him to the hood of his squad car to sign the warning ticket. Travis testified he was in the process of issuing the warning when

he asked the driver "again if there's anything illegal in the vehicle and if [he] could search the vehicle, and [the driver] said [he] could." The driver admitted to having "a bong" in the center console. Travis placed the driver in the back seat of his squad car. Travis approached defendant and asked him to exit the vehicle. Travis explained to defendant "that his friend was honest with [him]" and had admitted he had something illegal in the vehicle. Travis said defendant admitted he had something illegal as well.

¶ 9        Travis testified a Fairbury police officer arrived to assist him. Travis placed defendant in the back seat of the other officer's squad car and began searching the vehicle. Travis said he found "a bong and a grinder in the center console" and a "multicolored glass pipe with burnt residue in it" in the backseat. The other officer found the following inside a black book bag, which Travis said he had noticed defendant clinging to between his legs during the stop: six cans of beer, a "container with cannabis," a "couple of grinders," "another multicolored glass pipe," "a purple Crown Royal bag" with a "couple of digital scales, a cigarette roller, and an orange pill bottle with *** some pills in it." Travis testified that, after reading defendant his rights, defendant admitted everything was his except the digital scales, though he knew the scales were in the bag. Defendant was arrested.

¶ 10       Defense counsel posed the following questions:

"Q. Let me ask it this way. Was there ever a point after the car comes to rest in response to your emergency lights at the roadside that the two people in the car were free to go?

A. I would say after I, after I issued him his warning.

Q. Okay. And what if anything did you do to convey that to the driver?

- 4 -

A. I didn't. I didn't tell him he was free to go. I didn't physically say those words. But he could have just turned around and walked away.

Q. Um-hum. But you continued talking to him. You didn't give him the opportunity to walk away, did you?

A. Yeah. He was just talking back to me as well. We were having a conversation.

Q. Um-hum. You were wearing a uniform similar to what you've got on today?

A. Yes, sir.

Q. Badge, gun, the whole thing?

A. Yes, sir.

Q. Radio? Yes?

A. Yes.

Q. And there was no point at which you told [defendant] he was free to go?

A. No, sir.

* * *

Q. And did the *Miranda* come before or after somebody went through the black bag?

A. The *Miranda* came after."

Travis admitted that at no point "during this process" did he have a reason to believe there existed an outstanding search or arrest warrant for either passenger or the vehicle.

¶ 11    On cross-examination, Travis clarified, while he was pacing the vehicle with his in-car radar and his own speedometer, he noticed the vehicle weaving within its lane. The time of

day, the vehicle's speed, and its weaving caused Travis to believe he had reasonable articulable suspicion for a traffic stop. Once he approached the vehicle, Travis noticed "the way [defendant] was holding [the black book bag]." He said defendant was holding it against his leg which "just looked really suspicious." Travis thought "the way he was handling the book bag almost like it was indicative like he was trying to conceal something." Travis said he saw defendant clutching the bag with his hands and seemed nervous.

¶ 12        Travis testified it had been his recent common practice to ask the driver to exit the vehicle if he intended to ask for consent to search. As he was tearing the warning forms apart to give a copy to the driver, Travis asked for consent to search. The driver immediately consented. Travis admitted that if the driver did not consent, he would have been free to leave. In Travis's opinion, the length of the stop prior to receiving the driver's consent to search was not unusual or unreasonable.

¶ 13        On June 9, 2016, after considering the evidence, which included the video recording of the traffic stop and counsel's arguments, the trial court issued a written order denying defendant's motion to suppress. The court found Travis had authority to effectuate an arrest outside his jurisdiction because he did not use the powers of his office to obtain evidence that would not be available to private citizens. According to the court, Travis paced the vehicle, which any private citizen could have done, and found contraband during a search that would have been readily available and accessible to anyone who searched the vehicle. The court further found Travis had reasonable articulable suspicion to conduct an investigatory stop based upon the vehicle's speed. And finally, the court found the stop was not unduly prolonged when only six seconds had elapsed between the completion of the traffic stop and when Travis asked for consent to search the vehicle, and less than one minute later, the driver admitted to possessing drug paraphernalia.

¶ 14            On November 8, 2016, the case proceeded to a bench trial. The State announced it was dismissing count III and proceeding, upon defendant's request, with a stipulation of evidence on the remaining two counts. Both parties asked the court to consider the facts as testified to by Travis during the suppression hearing. The court found defendant guilty on both counts. Defendant filed a posttrial motion, reiterating his claims set forth in his motion to suppress. No immediate action was taken on this motion.

¶ 15            On March 1, 2017, the trial court sentenced defendant to 24 months of Treatment Alternatives for Safe Communities (TASC) probation on count I with a concurrent term of court supervision on count II. Defendant indicated he wished to appeal and the court directed the clerk to file a notice of appeal, which was filed on March 20, 2017. The Office of the State Appellate Defender (OSAD) was appointed to represent defendant on appeal.

¶ 16            On March 2, 2017, defendant filed a motion pursuant to section 40-10(e) of the Alcoholism and Other Drug Abuse and Dependency Act (the Act) (20 ILCS 301/40-10(e) (West 2016)) asking the trial court to vacate the judgment of conviction upon defendant's successful completion of TASC probation. No action was taken on this motion.

¶ 17            On January 22, 2018, on OSAD's motion, the pending appeal was dismissed so defendant's timely posttrial motion could be considered by the trial court. On January 31, 2018, the court considered defendant's posttrial motion and denied the same.

¶ 18            This appeal followed.

¶ 19                                II. ANALYSIS

¶ 20            On appeal, defendant argues the trial court erred by denying his motion to suppress because (1) Travis acted outside of his jurisdiction and was not authorized to effectuate a stop or

an arrest and (2) Travis unduly and illegally prolonged the stop. Defendant requests this court vacate his conviction.

¶ 21   First, we address the viability of this appeal in light of the status of defendant's conviction. In March 2017, defendant filed a motion pursuant to section 40-10(e) of the Act seeking an order vacating his conviction upon the successful completion of his TASC probation. The statute allows such relief only once. See 20 ILCS 301/40-10(e) (West 2016) (If the defendant has not previously been granted a vacation of judgment under this section, "the court shall vacate the judgment of conviction and dismiss the criminal proceedings against him or her unless, having considered the nature and circumstances of the offense and the history, character and condition of the individual, the court finds that the motion should not be granted."). Although the record does not indicate the trial court entered an order on defendant's motion, both parties assume, as mentioned in their respective briefs, defendant's conviction has been vacated, seemingly making this appeal moot. Consequently, he would be disqualified from obtaining future relief under this section. Because this decision could affect his qualifying status under section 40-10(e) of the Act, this appeal is viable.

¶ 22   Typically, a bifurcated standard of review applies when reviewing a ruling on a motion to suppress. See *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 49 (noting when reviewing a ruling on a motion to suppress, a trial court's findings of fact are reviewed under a manifest-weight-of-the-evidence standard, while the court's conclusions of law are reviewed *de novo*). Here, we will review the trial court's factual findings to determine if they are against the manifest weight of the evidence. Then, applying a *de novo* standard, we will determine whether the court's suppression ruling was appropriate by "undertaking our own assessment of the facts in relation to the issues presented." *People v. Moss*, 217 Ill. 2d 511, 518 (2005).

¶ 23                              A. The Officer's Jurisdiction

¶ 24       Travis did not dispute that the vehicle he followed committed traffic infractions outside his jurisdiction. The vehicle was weaving and speeding on the stretch of road between Fairbury and Forrest and began speeding again when it exited Forrest. It is well-established that a peace officer outside his jurisdiction may use section 107-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107-3 (West 2014)) as a basis for making an arrest. Section 107-3 provides: "Any person may arrest another when he has reasonable grounds to believe that an offense other than an ordinance violation is being committed." *Id.*

¶ 25       In other words, when a police officer leaves his jurisdiction, he does not lose the power to arrest that is possessed by any other person. Further, speeding is "an offense other than an ordinance violation." Thus, it would seem Travis had the same power as any other member of the public to arrest the driver in this case. However, an out-of-jurisdiction police officer may use only the powers an ordinary citizen has in making an arrest. See *People v. Kirvelaitis*, 315 Ill. App. 3d 667, 673 (2000). Travis testified he confirmed the vehicle was speeding (going 66 miles per hour in a 55 mile-per-hour zone) by pacing it with his squad's speedometer. He did not utilize his radar equipment. A private citizen cannot speed in order to catch a speeder. *Id.* Travis, then, acted beyond the rights given to private citizens when he exceeded the speed limit in order to arrest the driver. See *id.*

¶ 26       However, Travis also testified the driver was weaving within his lane and it is that action which prompted Travis to activate his on-board video camera. He said once he saw the vehicle weaving, he "went ahead and manually started the recording so it could catch that on there." Once the video camera was activated, it is disputable whether the driver continued to weave within his lane. According to the video, any movement of the vehicle from side-to-side within its

lane was slight. It did not appear that the vehicle crossed either the center lane or the fog line. Nevertheless, the driver seemed to acknowledge what Travis had observed. When told he was weaving, the driver immediately explained he had been adjusting his music, which seemed to demonstrate his acknowledgement of weaving within his lane.

¶ 27 Travis testified he believed his "PC was indicative of somebody who had been drinking and driving." According to his testimony, Travis had observed the vehicle weaving within its lane. The weaving could have been observed by a private citizen without the use of powers limited to a police officer. That is, here, Travis did not use the powers of his office to obtain evidence to arrest. See *People v. Lahr*, 147 Ill. 2d 379, 383 (1992); *People v. O'Connor*, 167 Ill. App. 3d 42, 46 (1988) (mentioning that an extraterritorial arrest will not be upheld if in making the arrest the officer uses the powers of his office to obtain evidence not available to private citizens). Consequently, we conclude the trial court's order denying defendant's motion to quash arrest and suppress evidence on this basis was not erroneous.

¶ 28                                  B. Length of the Stop

¶ 29 Defendant also contends his fourth amendment rights were violated when Travis unreasonably detained him after the conclusion of the traffic stop. For this reason, according to defendant, the trial court erred in denying his motion to suppress.

¶ 30 The Supreme Court has held that a seizure for the purpose of issuing a warning ticket can become unlawful if it is prolonged beyond the time reasonably required to complete that mission. *Illinois v. Cabelles*, 543 U.S. 405, 407 (2005). Reasonableness is determined under an objective standard based on the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). There is no bright-line rule regarding the duration of the stop. *People v. Baldwin*, 388 Ill. App. 3d 1028, 1034 (2009). Instead, the courts "employ a contextual, totality of the circumstances

- 10 -

analysis that includes consideration of the brevity of the stop and whether the police acted diligently during the stop." *Id.*

¶ 31 We note "there is no constitutional requirement that a police officer have any probable cause in order to ask an individual for consent to search." *People v. Phillips*, 264 Ill. App. 3d 213, 221-22 (1994). "In fact, it is an individual's valid consent that obviates the need for probable cause or a warrant." *Id.* We have concluded above the traffic stop was based on probable cause and was conducted within Travis's authority. From our viewing of the video recording of the stop, it was apparent Travis acted diligently when performing the ordinary inquiries, such as checking the driver's license, determining whether or not there were outstanding warrants, and inspecting the vehicle's registration and insurance. See *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). The question is whether Travis unreasonably detained the driver before getting his consent to search the vehicle. The answer is no.

¶ 32 Travis testified he was suspicious of illicit conduct because it was 3:45 a.m. and the vehicle had been speeding and weaving within its lane. However, after conducting the general inquiries, he decided to issue a warning ticket for speeding. He said when he reapproached the vehicle, he had decided he wanted "to try to get consent to search." In addition to being suspicious because of the time of day, the age of the occupants, and his observation of the traffic infractions, Travis said he was suspicious of the way defendant was clinging to a backpack between his legs. Travis testified he had recently put in to practice a procedure of asking the driver to exit the vehicle when he issued the ticket if he intended to ask for permission to search. Here, the driver exited the vehicle, walked back to Travis's squad, and was given the warning ticket. Within seconds of handing the driver the ticket—a moment otherwise defined as the conclusion of the traffic stop, Travis asked for and received consent to search. Within one minute, the driver admitted to having

- 11 -

drug paraphernalia in the vehicle. It should be noted that Travis asked the driver to exit the vehicle prior to the conclusion of the traffic stop.

¶ 33 Defendant claims Travis's "tactic" of having the driver exit the vehicle to issue the warning ticket unreasonably extended the stop beyond its initial purpose. During a lawful traffic stop, a police officer may order the driver out of the vehicle (*Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)), as well as the passengers (*Maryland v. Wilson*, 519 U.S. 408, 415 (1997)). See *People v. Sorenson*, 196 Ill. 2d 425, 433 (2001) ("[F]ollowing a lawful traffic stop, police may, as a matter of course, order the driver and any passengers out of the vehicle pending completion of the stop without violating the protections of the fourth amendment."). An officer's request for a driver to step out of the vehicle to issue a citation does not impermissibly extend the traffic stop. *People v. Staley*, 334 Ill. App. 3d 358, 366-67 (2002).

¶ 34 Because the vehicle had been lawfully detained for a traffic violation, Travis was within his authority to ask the driver to exit the vehicle prior to the stop's conclusion. See *Robinette*, 519 U.S. at 38. According to the video of the stop, there was no unreasonable delay between the conclusion of the stop, the driver's consent to search, and his admission that the vehicle contained drug paraphernalia. Based on this record, we find no error in the trial court's order denying defendant's motion to suppress.

¶ 35 III. CONCLUSION

¶ 36 For the foregoing reasons, we affirm the trial court's judgment.

¶ 37 Affirmed.