2021 IL App (2d) 180977-U
No. 2-18-0977
Order filed September 8, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-916 |
| PAUL K. BARKSDALE, | ) ) | Honorable Robbin J. Stuckert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   There was sufficient evidence to prove defendant guilty beyond a reasonable doubt. The trial court did not err in denying defendant's motion to dismiss, which argued that he was not timely provided with a preliminary hearing or indicted. The trial court also did not err in denying defendant's motion to quash arrest and suppress evidence, or in denying his motions to dismiss for speedy trial violations. Therefore, we affirm.

¶ 2    Following a jury trial, defendant, Paul K. Barksdale, was convicted of two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). On appeal, he argues that (1) he was not proven guilty beyond a reasonable doubt of one of the counts, (2) he was not given a preliminary hearing or indicted in a timely manner; (3) the trial court erred in

denying his motion to quash arrest and suppress evidence; and (4) his statutory and constitutional rights to a speedy trial were violated. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On December 9, 2014, defendant was charged by information with four counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). Defendant filed a speedy trial demand two days later.

¶ 5      On April 29, 2015, defendant filed a motion to dismiss the charges, alleging that he had not received a timely preliminary hearing. He filed an amended motion to dismiss the charges on May 6, 2015, and a subsequent motion to dismiss on August 31, 2015. On May 22, 2015, defendant filed a motion to quash arrest and suppress evidence, arguing that the officers acted outside of their jurisdiction and lacked probable cause. He filed a motion to suppress statements the same day, arguing that he was not informed of his *Miranda* rights and did not knowingly and intelligently waive them. Defendant filed a second motion to quash arrest and suppress evidence on April 22, 2016.

¶ 6      Meanwhile, on June 1, 2015, defendant was charged by indictment with three counts of predatory criminal sexual assault of a child. Count I alleged that defendant, who was over the age of 17, committed an act of sexual penetration with A.H., who was under the age of 13, in that he placed his finger in her sex organ. Count II alleged that he placed his penis in her sex organ, and count III alleged that he placed his penis in her mouth. On July 2, 2015, defendant again filed a speedy trial demand.

¶ 7      The State filed a motion to strike or deny defendant's motion to dismiss on October 14, 2015. It argued that the delays were caused by continuances requested by defendant's attorneys.

The trial court denied defendant's motion to dismiss on October 15, 2015. Defendant filed a motion to reconsider on October 30, 2015, which the trial court denied on December 10, 2015.

¶ 8    On August 29, 2016, the trial court denied defendant's motion to quash arrest and suppress evidence. He filed a motion to reconsider on September 27, 2016, which the trial court denied on November 29, 2016.

¶ 9    Defendant filed a motion to substitute judges on June 16, 2017, which was denied without prejudice on July 25, 2017.

¶ 10    On June 23, 2017, the State filed a motion *in limine* to admit hearsay evidence of A.H.'s prior statements.

¶ 11    Defendant filed a motion to dismiss on July 25, 2017, again arguing that he was not timely indicted. The State moved to dismiss the motion on *res judicata* grounds, arguing that the trial court had resolved defendant's allegations during the hearings on October 15 and December 10, 2015. At a hearing on October 27, 2017, defense counsel stated that "in a nutshell," his argument was that defendant was not arraigned in the proper timeframe. The State argued that such an argument was not present in defendant's motion, and defense counsel stated that it was because defendant was not formally arraigned until October 6, 2017. The trial court granted the State's motion to strike, but gave defendant leave to amend. Defendant filed an amended motion to dismiss on October 30, 2017, which the trial court denied on November 3, 2017.

¶ 12    On January 2, 2018, the trial court ruled that the State could present evidence of A.H.'s prior statements, specifically a video recording of a victim sensitive interview (VSI) conducted on December 2, 2014, and statements that she made to psychologist Caitlyn McIlwee during counseling sessions in fall 2014. It also ruled that the State could present evidence of defendant's prior sexual acts against A.H.

¶ 13    Defendant filed another motion to dismiss on March 29, 2018, asserting that his right to a speedy trial was violated. The trial court denied the motion on May 17, 2018. At that hearing, the trial court stated that on December 15, 2016, the case was continued by agreement to December 29, 2016, because defendant's attorney had been elected State's Attorney. On that day, the case was continued by agreement to February 3, 2017, at which time the case was continued by agreement to April 7, 2017. The order for April 7, 2017, appeared to have a pre-marked check mark that the case was continued by the defendant, but the transcript indicated that the case was continued by agreement to May 12, 2017. On that date, the special prosecutor stated that defense counsel was unable to be present due to a medical emergency, and that they had discussed continuing the date. The case was continued to June 23, 2017. The trial court ruled that defendant had failed to affirmatively establish a speedy trial violation.

¶ 14    Defendant filed a third motion to dismiss on the same grounds on August 21, 2018, which the trial court denied on August 23, 2018.

¶ 15    Testimony in defendant's trial began on August 29, 2018. A.H. testified as follows. She was born on March 16, 2002, and was 16 years old. Defendant was her cousin.[1] In February 2012, when she was almost 10 years old, she went to a family Mardi Gras party at the house of defendant and his fiancée. About 30 people were present. The children went up to the office with defendant to get the Wi-Fi password that was on a cable box. A.H. was the last one to leave the room, but before she could go, the door closed. Defendant started touching her "vaginal area." He then unzipped his pants, pulled out his genitals, and attempted in a forceful manner to get her to perform

---

[1] It appears from the evidence presented at trial that defendant was A.H.'s mother's cousin, but that A.H. referred to him as her cousin.

oral sex on him. A.H. considered cooperating because she did not want anyone to hear her. However, she decided not to and turned around, so "[i]t didn't happen." However, he had "briefly" put his penis in her mouth before she turned around. Defendant then pulled her pants down. She was "bent down," and he inserted his penis in her vagina. She could not say how long the contact lasted, but he "continuously inserted [his penis] into [her] body." She did not remember if he used a condom. Afterwards, she pulled up her pants and left the room. He might have told her not to say anything, but she was not sure. A.H. did not tell anyone right away because "that wasn't the first time that [she] had an incident with him[,] and [she] didn't think anyone would believe [her] considering [she'd] had other incidences." The other incidents involved touching her vaginal area over her clothing.

¶ 16    Later that evening, she was sitting in the living room on a lounge chair with a blanket. Other children and adults were in the room with her, watching a movie on the television. Defendant came and sat on the chair with her. She removed the blanket, but he grabbed it, put it over them, and said to move over. Defendant then began whispering to her about how she was growing up and how much hair she had grown "down there." He put his fingers around her vaginal area, and then inside her vagina. Defendant subsequently got up to get a drink. A.H. waited for five minutes, trying to decide whether to tell someone, and then ran downstairs to find her mother.

¶ 17    A.H.'s mom was "under the influence," but A.H. took her inside the bathroom. A.H.'s aunt Gwen and her cousin Carmen were also present. A.H. said that defendant had touched her, and Gwen asked where. A.H. pointed to her vaginal area. A.H. and her mother then left the party. A.H. did not mention the oral sex or the intercourse to anyone.

¶ 18    A.H. began seeing counselors afterwards, and in fall 2014, she told Dr. Caitlyn McIlwee that defendant had intercourse with her, though A.H. did not mention oral sex. A few days later,

for the first time, she explained in detail what had happened to Dr. Chante Jones. At trial, A.H.'s memory was "foggy" about the interview with Dr. Jones. She remembered saying that she bit defendant when he tried to insert his penis in her mouth and that pre-ejaculate came out, but she did not remember that occurring. She did not remember saying that she did not really bite him but closed her mouth, or that he held her hands behind her back during intercourse with one of his hands and had a condom in the other hand. A.H. remembered saying that he ripped the condom open with his teeth and put it on while in that position. The intercourse hurt but A.H. did not remember how long she was in pain after the intercourse, or whether it hurt for more than an hour. She had no vaginal bleeding as a result of the intercourse.

¶ 19    Arie Carter, A.H.'s mother testified as follows. Defendant was Arie's first cousin, and she and A.H. went to a party at his house on February 18, 2012. Later in the evening, A.H. came up to her, looking very upset, and said, "Mommy, Mommy, [defendant] is touching me again." Arie asked what she was saying and pulled her into the bathroom. A.H. said that defendant was touching her, and Arie asked where. A.H. shook her hand near her vaginal area. Arie found her sister, Gwen, and brought her into the bathroom. A.H. told Gwen that defendant had touched her and shook her hand near her vagina.

¶ 20    Arie confronted defendant alone in the garage and relayed what A.H. had said. Defendant said that there must be some mistake, and Arie said that there was not, as she had taught A.H. to tell her if someone was touching her. Arie had been planning to spend the night at defendant's house with A.H. and other family members, but said that they were leaving. Defendant said not to go, but Arie replied, "What, we gonna [*sic*] stay here overnight? You crazy [*sic*]." When she was heading out the front door, defendant appeared, and Arie told him that he was a very sick individual and that she was going to go home and find out what he had done to A.H., and how badly "he

messed up her head." She did not remember what defendant replied, but he did not verbally berate Arie, explode at her in any way, or call A.H. a whore or any other disparaging terms.

¶ 21    The next day, Arie asked A.H. if she should call the police. A.H. wanted defendant to get help because "she was very afraid of repeating what happened to her." Arie asked if defendant had touched her with his bare hand and if there was skin-to-skin contact, and A.H. replied in the negative. Therefore, Arie thought that the contact was over clothing, and she did not call the police. She enrolled A.H. in weekly counseling, which began about four months after the incident. Arie did not feel like A.H. was progressing in therapy, and in fall 2014, A.H. began another counseling service in which she met with Dr. McIlwee. After several sessions, she disclosed that defendant had raped her.

¶ 22    Gwen Carter testified that the night of the party, she saw that Arie was visibly upset and saying that they had to go. Gwen asked what was wrong, and Arie pulled her and A.H. into the bathroom. Arie said that defendant had touched A.H., and Gwen asked A.H., "What do you mean he touched you?" A.H. waived her hand in front of her vagina. Gwen then went to get belongings from a bedroom, and defendant came in. She relayed that Arie had said that he had touched A.H., and defendant replied, "She started it." Gwen responded, "She's a child."

¶ 23    Lennis Michael Barrois testified that he was a cousin of defendant and Arie, and that he was watching a movie with others during the party.  A.H. and defendant were on a loveseat behind him and had a shawl on them. At one point Barrois turned around to see their response to something that had happened in the movie, and he saw "some kind of action" like a "hand going up." He did not see defendant's hand but rather saw defendant's elbow and the shawl going up. The shawl then fell to the ground. Barrois looked around to see other relatives' reactions, but they had all fallen asleep. He turned back to the television, then turned around again to ask a question, and defendant

was red and flushed like he was nervous. Defendant looked like a "tomato," so Barrois laughed. Barrois admitted that he had been drinking and that the incident did not seem suspicious at the time. In his statement to the police, Barrois did not mention a shawl, and he wrote that A.H.'s mood was jovial. He testified that she was smiling and laughing.

¶ 24    Caitlyn McIlwee testified that she was a graduate student extern in clinical psychology in the fall 2014, when A.H. began weekly counseling sessions with her. During the fourth or fifth session, in November 2014, McIlwee asked if A.H. had been sexually active in the past. A.H. disclosed that her cousin had sexually penetrated her several years before during a family holiday, and that she had not previously told anyone. Specifically, A.H. "implied" that there was sexual penetration. McIlwee did not ask A.H. for any details because McIlwee knew that she would have to report the information to the Department of Children and Family Services, which would investigate. A.H. appeared nervous and embarrassed when she disclosed this information. At the initial intake session, A.H. and her mother had said that a cousin had touched her over her clothing.

¶ 25    Dr. Chante Jones testified that she conducted a VSI with A.H. on December 2, 2014, at the Chicago Children's Advocacy Center. The interview was recorded, and an edited version of the interview was played for the jury, in which A.H. stated as follows. The Mardi Gras party at issue took place when she was "just getting to seven" years old. The kids had electronic devices and went to the computer room to get the Wi-Fi password. A.H. stated that she had an iPod at the time, but then corrected herself and said she did not, but rather she just went along with the other kids. Defendant had touched her on previous occasions, so she tried not to be the last person to leave the room, but she was. At that moment the door "snatched, door closed, locked, key gone." A.H. did not "remember the next part" and had "tried so hard to forget it." All that she remembered was that it was "gross." She remembered defendant pulling down her pants and that it hurt when he

inserted his penis inside her vagina. She was standing up, a little bent over, and was trying to push him back. Defendant had pulled his penis out of his pants without removing his clothing. He held A.H.'s hands behind her back with one of his hands. With the other hand, he took a condom from the table, used his teeth to open the wrapper, and put it on. He ejaculated in the condom and then threw it in the trash. Afterwards, he said not to tell anyone or else they would know how "dirty" she was and she would have to "pay for it." He pushed her out of the room and stayed there for about 30 minutes. She thought that he did not see any need for her after he "had his fun." A.H. had cooperated, which she now regretted, because she thought defendant would hurt her.

¶ 26    A.H. stated that defendant had first tried to put his penis in her mouth, and she bit him. She then said that she did not really bite him, but rather closed her mouth. A.H. later stated that defendant stuck his penis in her mouth, and pre-ejaculate came out, which tasted like alcohol.

¶ 27    Later that night, A.H. was sitting on a long chair in the living room watching a movie with family members. A.H. had a blanket on her because she was shaken up. Defendant told her to move over. A.H. tried to give someone else the blanket, but defendant put the blanket over them. Defendant touched her over her vagina, on her vagina, and then put a finger in her vagina. It felt "good" to A.H., but she felt "gross about it." He asked if it felt better than the last time, and then got up to get something to drink. A.H. went to her mother, took her into the bathroom, said that defendant had touched her again, and started crying. On prior occasions, defendant touched her vagina over her clothing when he hugged her and lifted her up on his shoulders, but her mother did not believe her then. A.H.'s aunt Gwen and cousin Carmen were also present in the bathroom, and they comforted her. A.H.'s mother confronted defendant in the garage, and she later told A.H. that she slapped him. She put A.H. in the car, had an uncle stand in front of the car, and gathered their things to leave.

¶ 28    A videotape of a police interview of defendant from December 8, 2014, was played for the jury. We summarize defendant's statements. At the party, Arie accused him of touching A.H. He told her that the accusation was false. Rather, what had actually happened was when he hugged A.H. upon her arrival, she purposely touched his penis in a "swiping motion." He later characterized it as a "squeeze." He told her that it was not appropriate, and that if it happened again, he would tell her mom. Defendant did not tell Arie right away because he may have misconstrued what happened and did not think that it was worth mentioning. Further, he was not an alarmist. When asked if something had happened because A.H. came onto him and it was a "heat of passion" situation, defendant said that A.H. was a 10-year-old child and that "heat of passion" would not come into it. Defendant was never alone with A.H. during the party but rather was staying away from her based on her touching his penis. He sat next to A.H. during the movie because other seats were not available, and it did not occur to him that it was not a good idea to sit next to her.

¶ 29    Jacqueline Richmond, defendant's sister, testified that she was present at the party and spent the night at defendant's house. She did not notice anything out of the ordinary with A.H. or defendant that day. Richmond did not know at the time why A.H., Arie, and Gwen had left early, but she found out a few days later. In a statement to police, Richmond said that she had seen defendant go upstairs with the children to help out with the Wi-Fi.

¶ 30    On February 21, 2012, defendant wrote Richmond and their brother Charles an e-mail stating:

"Jackie/Charles

First let me start by saying how Sorry [*sic*] I am for disgracing myself, hurting [A.H.] and the rest of the family.

The reason I am not calling is because I don't feel that I have the words to say exactly what I should, how I should.

I am currently searching my care provider's site for a Therapist [*sic*] in a reasonable area.

I am so sorry that this happened. I had no idea that this could possibly happen, however, after hearing the list of incidents rattled off like a shopping list, it is clear to me and all my family that I need to seriously address these suppressed emotions.

I will be giving all of you regular updates as to the progress of the therapy sessions as well as any diagnosis.

This is not nearly enough but until my head clears and I can get my senses back in order, it's all I can say right now.

I dare not communicate with Arie at this time due to the volitility [*sic*] of the situation, however, I will be contacting her.

Again, I am so sorry to all of my family and loved ones for this shame.

It is my mission and focus to address my problems so that hopefully one day I can earn the love and respect of everyone affected by this.

I love you all.

Paul Barksdale"

Richmond testified that the e-mail was in reply to a message she had sent to him expressing frustration and anger with him over his drug and alcohol problems, and the lack of help he provided when their mother was sick. She wanted him to receive therapy for his addictions. The following day, Richmond sent defendant an e-mail with the subject line "Re therapy – update?" without any additional content. Defendant replied the same day in a message that stated:

"Attached is a list of providers I am working off to get an appointment.

Since I am a new member, they typically take longer to give you the appointment.

I'm on it.

Paul Barksdale."

They then exchanged additional messages regarding counseling.

¶ 31    At the police interview on December 8, 2014, the police confronted defendant with the e-mails. Defendant said that the e-mails showed "how [he] felt." "However, in [his] opinion, those e-mails [were] ambiguous."

¶ 32    Defendant testified as follows. The allegations against him were "completely false" and he never sexually touched A.H., penetrated her, or made her perform oral sex on him. Rather, when A.H. entered the house and hugged him, she touched his penis. He could not accurately describe exactly what she did, but it made an "indelible impression" on him. The e-mail at issue was taken completely out of context. His reference to "disgracing himself" was about drinking and doing drugs when his mom was sick. Also, after the accusations that he touched A.H. at the Mardi Gras party, he "exploded at Arie and [A.H.] and said some hurtful things," along the lines of A.H. being disgusting and acting like a whore. The "shopping list of things" in the e-mail was in reference to incidents like him getting in a car crash at 2 a.m. and abandoning his vehicle. After the accident, the police called him but he did not answer, so they called Richmond, who was left wondering if defendant was alive. He sought therapy for his drug and alcohol problem. Defendant did not want to communicate with Arie during this time because he was still very angry.

¶ 33    Defendant admitted that he stated in an e-mail that he had an appointment at Heartland Counseling. The search results attached to the e-mail showed that Heartland Counseling provided

treatment for sexual and child abuse, but also stress management. He saw a therapist named Deborah, who was listed on the attachment under "grief counseling."

¶ 34    The jury found defendant guilty of counts I and II, and not guilty of count III, On September 28, 2018, defendant filed a motion for judgment *n.o.v.* or a new trial. Defendant refused to appear for the hearing on the motion and sentencing. The trial court denied the motion and sentenced him to 15 years' imprisonment on each count, to run consecutively.

¶ 35    Defendant timely appealed. He was originally represented on appeal by the Office of the State Appellate Defender (OSAD). On May 18, 2020, defendant filed a motion seeking to have a *pro bono* private attorney appointed or proceed *pro se*. OSAD filed the appellant brief the following day. We subsequently granted defendant's request to proceed *pro se*, ruling that the appellant brief would remain on file but that defendant could file a *pro se* supplemental brief, which he did.

¶ 36                              II. ANALYSIS

¶ 37    On appeal, defendant argues (through the OSAD brief) that he was not proven guilty beyond a reasonable doubt that he placed his penis in A.H.'s sex organ. In his *pro se* supplemental brief, he argues that he was not provided a preliminary hearing or indicted in a timely manner; the trial court erred in denying his motion to quash arrest and suppress evidence; and his statutory and constitutional rights to a speedy trial were violated. We examine each argument in turn.

¶ 38                          A. Sufficiency of the Evidence

¶ 39    When examining the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the

responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 40    Defendant contests only his conviction on count 2, that he placed his penis in A.H.'s sex organ. He does not dispute that the evidence showed that he was 17 years or older and that A.H. was under 13 years old, but he argues that the State failed to prove that he "committed an act of sexual penetration." 720 ILCS 5/11-1.40(a)(1) (West 2012). "Sexual penetration" is defined in relevant part as "any contact, however slight, between the sex organ *** of one person and *** the sex organ *** of another person, or any intrusion, however slight, of any part of the body of one person *** into the sex organ *** of another person." 720 ILCS 5/11-0.1 (West 2012).

¶ 41    Defendant argues that A.H.'s allegations on this count were so inconsistent and contrary that they were insufficient to prove him guilty. Defendant argues that the evidence showed that while A.H. made an initial outcry to her mother and aunt on the night of the party, she alleged at that time that defendant had only "touched" her vagina, confirming the next day to her mother that there was no "skin-to-skin" contact. Defendant points out that in the fall of 2014, when A.H. began seeing Dr. McIlwee, she said that a cousin had touched her inappropriately over her clothing. Defendant highlights that it was only at the fourth or fifth therapy session, when McIlwee asked A.H. whether she was sexually active, that A.H. said that she had had sex with her cousin, implying that there was sexual penetration. Defendant argues that it was not until December 2014, during the VSI with Dr. Jones, that A.H. gave a detailed statement alleging that he had penetrated her vagina with his penis.

¶ 42    Defendant argues that the VSI did not occur until two years after the party, contained many contradictions, and lacked believability. He highlights that A.H. first said that she did not "remember the next part" of what happened and "tried so hard to forget it," and that all that she remembered was that it was "gross" and that "it hurt." Defendant argues that she nevertheless went on to give a detailed story of defendant holding both of her hands behind her back with one hand, grabbing a condom from the table with his free hand, opening it with his teeth, and placing it on himself with one hand. Defendant argues that, in contrast, at trial A.H. could not recall if he used a condom at all. Defendant asserts that A.H. likewise detailed in her VSI that she was the last child in the computer room and then "it snatched, door closed, locked, key gone," miming someone locking a door and throwing away a key. Defendant argues that during her trial testimony, she did not remember how the door closed, and she testified that she left the room afterwards, making no mention of having to unlock the door. In her VSI, she said that defendant told her that if she told anyone, they would know how "dirty" she was and that she would "pay for it," whereas at trial she testified that she thought he said not to say anything, but she was not sure.

¶ 43    Defendant further argues that another inconsistency during the VSI was that she asserted that defendant tried to put his penis in her mouth and that she bit him, but when Dr. Jones asked about this later in the interview, A.H. admitted that she did not bite him but rather just closed her mouth. Defendant maintains that she told a third version moments later saying that he did put his penis in her mouth and pre-ejaculate came out, which tasted like alcohol. Defendant contends that these inconsistencies made it appear that A.H. was making things up as she went along. Defendant argues that this is especially true considering that she narrated some of his alleged thoughts in the matter, such as saying that he initially did not use a condom because he "wanted to see how it felt without it" and "didn't feel a need for it," but then used a condom because he did not "want to get

[her] pregnant." Defendant also points to A.H.'s interview statement that afterwards, he "didn't seem to have much need for" her because he had "had his fun." Defendant argues that these were not things that he vocalized to her, so it was unclear how at 9 or 12 years old she could express the alleged thoughts of a grown man about sex acts. Defendant asserts that it shows that much of what she said during the interview was fanciful storytelling. He argues that it is questionable that at the time of trial not only did A.H. not remember many details of the incident, she also did not even remember telling those details to Dr. Jones, showing that her memory was not reliable.

¶ 44    Defendant additionally argues that there was no corroboration of A.H.'s claim that he penetrated her vagina with his penis, particularly no bleeding or other physical proof that it happened, and no witnesses testifying that A.H. did not come out of the office or that her whereabouts were unknown while the incident took place. Defendant argues that there was also no testimony about her demeanor after the act to support her allegations, with the only testimony about her demeanor being several hours later in the living room, with Barrois testifying that she was jovial and smiling and laughing.

¶ 45    Defendant concludes that given A.H.'s prior statements to her mother and aunt, made closer in time to the actual event that defendant only touched her vagina, the complete lack of physical evidence of actual penetration, and all of the inconsistencies in her statements, A.H.'s testimony was not sufficient to establish his guilt beyond a reasonable doubt.

¶ 46    Viewing the evidence in the light most favorable to the State, we conclude that there was sufficient evidence that defendant inserted his penis into A.H.'s vagina, such that he was proven guilty of count 2 beyond a reasonable doubt. In both her trial testimony and the VSI, A.H. stated that at the Mardi Gras party on February 18, 2012: she went upstairs with the children to get the Wi-Fi password; that she was the last person in the office with defendant; that the door closed;

defendant unzipped his pants and took out his penis; defendant pulled her pants down; he inserted his penis in her vagina while she was bent over; she left the room; he later sat down with her in the living room while everyone was watching a movie; he put a blanket over them; he inserted his finger in her vagina; he got up to get a drink; she ran and got Arie; and she told Arie, Gwen, and Carmen that defendant had touched her vagina, without saying that he had penetrated her with his penis or finger. The "testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted by the defendant." *People v. Harris*, 2018 IL 121932, ¶ 27. Moreover, there was corroboration for parts of A.H.'s description of what took place that day, such as Richmond telling the police that she had seen defendant go upstairs with the children to help with Wi-Fi, Barrois's observation of hand movements under the blanket during the movie and defendant looking flushed and nervous, and Arie's and Gwen's corroboration of what A.H. told them that night.

¶ 47 Further, Gwen testified that when she confronted defendant about touching A.H., his response was, "She started it," as opposed to denying that he ever touched her, as he subsequently stated to the police. Strikingly, in an e-mail from three days after the party, defendant stated that he was sorry for "disgracing [himself], hurting [A.H.] and the rest of the family." He stated that he was seeking therapy and that he "dare not communicate with Arie at this time due to the volitility [*sic*] of the situation." Defendant testified that the e-mail was related to his drug and alcohol problems, but that would not explain the timing of the e-mail or why he specifically mentioned hurting A.H. and avoiding Arie. Defendant testified that the references to A.H. and Arie were because he exploded at them at the party and said hurtful things, but Arie testified that he did not say such things. Additionally, defendant did not provide this explanation during his interview with the police, instead saying that the e-mail was "ambiguous."

¶ 48    Defendant highlights the length of time that passed before A.H. said that he had penetrated her with his penis and various inconsistencies between the VSI and her trial testimony. However, Arie testified that A.H. was not progressing in therapy so she enrolled her with another counseling service with Dr. McIlwee in fall 2014, and A.H. made the disclosure after several sessions. Therefore, the jury could have inferred that A.H. made the disclosure because she felt a stronger connection to McIlwee, and/or A.H. was getting older and became more comfortable talking about what happened. Though there were inconsistencies between the VSI and the trial testimony, it was the jury's role to resolve inconsistencies and conflicts in the evidence. *Sutherland*, 223 Ill. 2d at 242. Given that A.H. was less than 10 when the incident occurred, two years had passed when she was interviewed for the VSI, and about another four years passed before she testified, it is understandable that there may be some differences in her recitation of events, and that she could not remember certain things. See *People v. Olla*, 2018 IL App 2d 160118, ¶ 36 (where child sexual abuse victim was about 9 at the time of the abuse and 12 years old at trial, "[c]ommon sense dictate[d] that she was being truthful and that the inconsistencies were due to her young age and the time that passed between the events and the trial."). Additionally, as discussed, the central sequence of events that A.H. relayed was consistent. The delay in reporting the incident to the police would also eliminate any expectation that there would be physical evidence of the penetration.

¶ 49    In contrast to A.H.'s testimony, defendant testified that she grabbed his penis when he hugged her in greeting. The jury could have discredited his assertion that a nine-year-old would touch or squeeze his penis, or that he would not tell A.H.'s mother that she did so. Defendant stated during the police interview that he therefore stayed away from A.H. during the party, yet also stated that it did not occur to him that it would not be a good idea to sit right next to her on the

chair while watching a movie. See *People v. Nyberg*, 275 Ill. App. 3d 570, 579 (1995) ("When a defendant elects to explain the circumstances of a crime, he is bound to tell a reasonable story or be judged by its improbabilities and inconsistencies.").

¶ 50    Based on all of these considerations, there was sufficient evidence to prove defendant guilty beyond a reasonable doubt of count 2.

¶ 51                                      B. Preliminary Hearing

¶ 52    We next address defendant's *pro se* arguments. First, he argues that his statutory and constitutional rights were violated because he was not given a preliminary hearing or indicted within 30 days, such that he was held without probable cause for over 174 days. Defendant requests that we therefore vacate the charges and indictments against him.

¶ 53    Article I, section 7 of the Illinois Constitution provides, "No person shall be held to answer for a crime punishable by death or by imprisonment in the penitentiary unless either the initial charge has been brought by indictment of a grand jury or the person has been given a prompt preliminary hearing to establish probable cause." Ill. Const.1970, art. I, sec. 7. A defendant charged by information is entitled to a preliminary hearing to determine whether there is probable cause that the defendant committed an offense. 725 ILCS 5/111-2 (West 2014).

¶ 54    Section 109-3.1(b) of the Criminal Code of 1963 (Criminal Code) (725 ILCS 5/109-3.1 (West 2014)) provides, as pertinent here, "Every person in custody in this State for the alleged commission of a felony shall receive either a preliminary examination as provided in Section 109-3 or an indictment by Grand Jury as provided in Section 111-2, within 30 days from the date he or she was taken into custody." The provision is not applicable if, among other things, "delay is occasioned by the defendant." *Id.* § 109-3.1(b)(1). A "[d]elay occasioned by the defendant shall

temporarily suspend, for the time of the delay, the period within which the preliminary examination must be held." *Id.* § 109-3.1(c).

¶ 55    If section 109-3.1 is violated, "[u]pon the written motion of the defendant made prior to trial before or after a plea has been entered the court may dismiss the indictment, information or complaint ***." 725 ILCS 5/114-1(a) (West 2014). However, such a dismissal "shall not prevent the return of a new indictment or the filing of a new charge, and upon such dismissal the court may order that the defendant be held in custody *** pending the return of a new indictment or the filing of a new charge." *Id.* § 114-1(e) (West 2014). Such a dismissal is therefore without prejudice. *People v. Bartee*, 177 Ill. App. 3d 937, 940-41 (1988).

¶ 56    Defendant sets forth his argument as if the trial court is required to dismiss charges if a defendant does not obtain a timely preliminary hearing. However, the statute states that the trial court "may" dismiss the charges (725 ILCS 5/114-1(a) (West 2014)), indicating that the decision is within the trial court's discretion (*People v. One GMC*, 2011 IL 110236, ¶ 16), a standard which the appellate court has applied (see *People v. Clark*, 231 Ill. App. 3d 504, 507-08 (1992) (trial court has the discretion to dismiss a motion under section 114-1)).

¶ 57    Defendant was arrested on December 8, 2014, and appeared in court the following day. The trial court informed defendant of the charges and sentencing ranges. It appointed the public defender to represent defendant, who requested that the case be set to January 7, 2015. The order for continuance stated that it was "By Agreement." On that date, the public defender asked that the case be set to February 11, 2015. The order for continuance again stated that it was "By Agreement." On February 11, 2015, Rick Amato entered his appearance for defendant, and the public defender was discharged. The case was continued to March 18, 2015. On that date, Amato asked to have defendant brought over from jail to "address a preliminary hearing." The order for

continuance stated that the case was continued to March 25, 2015, on defendant's motion. On March 25, 2015, Amato stated that they were "going to put this over to April 7th" and address preliminary hearing and indictment issues then. The order stated that the case was continued "By Agreement." On April 7, 2015, Amato asked that defendant be brought over to discuss the preliminary hearing. The order stated that the case was continued to April 29, 2015, on defendant's motion.

¶ 58    On April 29, 2015, defendant filed a motion to dismiss the charges, alleging that he had not received a timely preliminary hearing. Amato asked for a status hearing on May 6, 2015. The order stated that the case was continued on defendant's motion. Defendant filed an amended motion to dismiss the charges on May 6, 2015. At a hearing that day, Amato asked for defendant to be brought over. The order stated that a continuance to May 20, 2015, was by agreement. Amato again asked for defendant to be brought over that day, and the case was continued to June 4, 2015, by agreement. Defendant was charged by indictment on June 1, 2015.

¶ 59    The trial court held a hearing on defendant's motion to dismiss on October 15, 2015. It ruled that defendant "had agreed to hearing his motions on a certain date, moved to continue those by agreement as to those dates as well," after which he was indicted.

¶ 60    " 'A delay is considered to have been occasioned by the defendant when the defendant's acts caused or contributed to the delay. [Citation.] When a defense attorney requests a continuance on behalf of a defendant, any delay caused by that continuance will obviously be attributed to the defendant. [Citation.]' " *People v. Daniels*, 2015 IL App (2d) 130517, ¶ 20 (quoting *People v. Kaczmarek,* 207 Ill. 2d 288, 296 (2003)). Given that the continuances were all either by agreement or at defendant's request, the trial court did not abuse its discretion in denying defendant's motion to dismiss on the basis that the defendant occasioned the delay (see 725 ILCS 5/109-3.1(b)(1)

(West 2014)), in that his attorney's acts caused or contributed to the delay (see *Daniels*, 2015 IL App (2d) 130517, ¶¶ 20, 28)

¶ 61 Moreover, as mentioned, section 114-1(e) states that even after a dismissal, the State may file new charges, and the trial court may order that the defendant stay in custody while awaiting the new charges. 725 ILCS 5/114-1(e) (West 2014). Even if the trial court had granted defendant's motion to dismiss, therefore, the State would have simply re-charged him. Further, "[o]nce a defendant is properly indicted, there is no necessity for a preliminary hearing to establish probable cause." *People v. Torres*, 93 Ill. App. 3d 718, 720 (1981). Defendant was indicted on June 1, 2015, about three years before his trial. The United States Supreme Court has held that "although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that defendant was detained pending trial without a determination of probable cause." *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975). Given this authority, defendant has not adequately explained what practical relief he would be entitled to and why, even if the trial court had erred in denying his motion to dismiss. See *People v. Bailey*, 2019 IL App (3d) 180396, ¶ 22 (a reviewing court is not a repository into which an appellant may foist the burden of argument and research, nor is it our function or obligation to act as an advocate, and the failure to clearly define issues and support them with authority results in forfeiture of the argument).

¶ 62                    C. Motion to Quash Arrest and Suppress Evidence

¶ 63 Defendant's next *pro se* argument is that the trial court erred in denying his motion to quash arrest and suppress evidence. Defendant contends that he was arrested without a warrant or probable cause.

¶ 64     At a hearing on a motion to suppress, the defendant must make a *prima facie* case that the evidence was obtained by an illegal seizure. *People v. Bass*, 2021 IL 125434, ¶ 21. If the defendant meets this burden, the burden shifts to the State to present rebuttal evidence, though the ultimate burden of proof remains with the defendant. *Id.* In reviewing a ruling on a motion to suppress, we defer to the trial court's factual findings and will reject them only if they are against the manifest weight of the evidence. *People v. Lindsey*, 2020 IL 124289, ¶ 14. We accord this deference because the trial court is in a superior position to determine and weigh the witnesses' credibility, observe their demeanor, and resolve conflicts in their testimony. *People v. Lee*, 214 Ill. 2d 476, 483-84 (2005). However, we review *de novo* the ultimate legal ruling on the motion to suppress. *Lindsey*, 2020 IL 124289, ¶ 14.

¶ 65     In this case, the police arrested defendant without a warrant. An arrest without a warrant is valid only if it is supported by probable cause to arrest. *People v. Grant*, 2013 IL 112734, ¶ 11; see also 725 ILCS 5/107-2(1)(c) (West 2014). "[P]robable cause exists when the facts known to the officer at the time are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime, based on the totality of the circumstances." *People v. Gocmen*, 2018 IL 122388, ¶ 19. The standard is the probability of criminal activity as opposed to proof beyond a reasonable doubt or that the crime more likely has occurred than not. *Id.* In assessing whether probable cause exists, an officer may rely on their law enforcement training and experience. *People v. Hill*, 2020 IL 124595, ¶ 23. "[W]hen officers are working in concert, probable cause can be established from all the information collectively received by the officers, even if that information is not specifically known to the officer who made the arrest." *People v. Stroud*, 392 Ill. App. 3d 776, 805 (2009).

¶ 66    At the hearing on defendant's motion to quash arrest and suppress evidence, Detective Jeremy Grubbs testified that he assisted Detective Hill in this investigation. They learned of the allegations in November 2014. Prior to arresting defendant, he and Hill had observed the VSI conducted on December 2, 2014. They also interviewed Arie and Gwen, who corroborated that A.H. told them at the party that defendant had touched her. Gwen further said that she confronted defendant afterwards, and that he said that A.H. started it. Hill provided consistent testimony and further testified that she reviewed the e-mail chain in which defendant stated that he was sorry for hurting A.H. and disgracing himself, and that he was seeking counseling. She further testified that A.H. identified defendant from a driver's license photo, and that the license showed defendant's date of birth. The trial court discussed the evidence presented and concluded that the police had "a plethora of information" at the time of defendant's arrest to establish probable cause, and it denied defendant's motion.

¶ 67    We agree with the trial court's ruling on the motion to suppress. We have set forth A.H.'s account of events in the VSI (see *supra* ¶¶ 25-27), in which she described that she attended the Mardi Gras party at defendant's house; that she was the last child to leave the office, at which point the door closed; that defendant pulled down her pants and inserted his penis in her vagina; that he put his penis in her mouth at some point; that he later sat next to her while she and other relatives were watching a movie, and he put his finger in her vagina; that she then told Arie and Gwen that defendant had touched her vagina; and that they therefore left the party. The police corroborated with Arie and Gwen that A.H. made such an accusation the night of the party, and Gwen stated that when she confronted defendant the night of the party, defendant said that A.H. had started it. The police also had in their possession an e-mail from four days after the party in which defendant stated that he was "Sorry [*sic*] *** for disgracing [himself], hurting [A.H.] and the rest of the

family" and was seeking therapy." Accordingly, the police had probable cause to arrest defendant on December 8, 2014.

¶ 68    Defendant cites *People v. Lee*, 214 Ill. 2d 476 (2005), in arguing that "firsthand observation is necessary to effectuate a warrantless arrest for the immediate commission of an offense." He notes that neither Grubbs nor Hill observed him commit any crime. In *Lee*, a citizen complained that three men were selling drugs on a corner which had been designated by the city as having a lot of drug and gang activity. The police observed defendant and two other men for a few minutes and saw them speak to the driver of a van who drove up. *Id.* at 478. The officers patted down the men and did not find any contraband, but they still arrested them for violating a drug-loitering ordinance. *Id.* at 478. A search incident to the arrest revealed drugs on defendant's person. *Id.* at 481.

¶ 69    The supreme court held that the informant's tip provided the officers with reasonable suspicion to conduct a *Terry* stop (*id.* at 488) but that the officers lacked probable cause to arrest the defendant for a violation of the ordinance (*id.* at 485). The court stated that "the officers should have waited and watched for some overt act manifesting that defendant intended to engage in drug-related activity." *Id.* at 488.

¶ 70    Contrary to defendant's argument, *Lee* did not hold that the police must observe a crime first-hand in order to conduct a warrantless arrest. Rather, the court stated that the police must have probable cause to arrest a defendant. *Id.* at 484. The police in *Lee* lacked probable cause because they received information for an informant about unnamed individuals, and they did not observe the defendant committing a crime. In contrast, here A.H. directly identified defendant as the perpetrator of the crimes, and there was also corroborating evidence in the form of interviews with Arie and Gwen, and defendant's e-mail.

¶ 71    Defendant similarly cites *People v. Contreras*, 2011 IL App (2d) 100930, and *People v. Hyland*, 2012 IL App (1st) 110966, for the proposition that an officer must have firsthand awareness or personal knowledge of the commission of a crime to conduct a warrantless arrest. *Contreras* is inapposite because the court was examining section 107-4(a-3)(2) of the Code of Criminal Procedure (725 ILCS 5/107-4 (West 2008)), which allows an officer to make an arrest anywhere in the state if the officer is on duty and "becomes personally aware of the immediate commission of" a crime. However, an officer may alternatively make an arrest in any jurisdiction in the state if, among other things, the officer is investigating criminal activity that occurred in the officer's primary jurisdiction (725 ILCS 5/107-4(a-3)(1) (West 2014)) or if the officer is requested to by another law enforcement official in the state (725 ILCS 5/107-4(a-3)(3) (West 2014)). *Hyland* is distinguishable because the State presented evidence only that the officer relied on an investigative alert for arresting the defendant, but the State failed to present evidence that the underlying fact that the alert established probable cause to arrest him. *Hyland*, 2012 IL App (1st) 110966, ¶ 25. Such a scenario is not present here.

¶ 72                                    D. Speedy Trial

¶ 73    Defendant's final *pro se* argument is that his statutory and constitutional rights to a speedy trial were violated. Section 103-5(a) of the Code of Criminal Procedure states, in relevant part:

> "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***. Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." 725 ILCS 5/103-5 (West 2014).

If the defendant is not tried within the statutorily-mandated period, the charges against him must be dismissed. 725 ILCS 5/103-5(d), 114-(1)(a)(1) (West 2014); *People v. Woodrum*, 223 Ill. 2d 286, 299 (2006).

¶ 74    The speedy trial term is calculated by excluding the first day and including the last; however, if the last day is a Saturday, Sunday, or holiday, it is also excluded. 5 ILCS 70/1.11 (West 2014). Significantly, any delays attributable to the defendant are not included in the computation. 725 ILCS 5/103-5(a) (West 2014). "A delay is occasioned by a defendant when his act caused or contributed to a delay resulting in a postponement of his trial," including requests and agreements for a continuance. *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 57. Any type of motion filed by the defendant that eliminates the possibility that the case could immediately be set for a trial also constitutes an affirmative act of delay attributable to the defendant. *People v. Myers*, 352 Ill. App. 3d at 684, 688 (2004).

¶ 75    The State has the duty to bring the defendant to trial within the statutorily-required period, but the defendant has the burden of establishing a speedy trial violation. *People v. Mosley*, 2016 IL App (5th) 130223, ¶ 10. The trial court's determination of who is responsible for the delay will not be reversed absent an abuse of discretion, but we review *de novo* the ultimate question of whether the defendant's statutory right to a speedy trial was violated. *Janusz*, 2020 IL App (2d) 190017, ¶ 56.

¶ 76    Defendant argues that all of the time from an arrest to the arraignment can only be attributed to the State. However, in *Janusz*, we rejected the argument that section 103-5(a) has an implicit time frame for an arraignment, or that delays prior to arraignment cannot be attributed to the defendant. *Janusz*, 2020 IL App (2d) 190017, ¶¶ 59-61.

¶ 77    Defendant additionally argues that the trial judge's absence caused about 175 days of "no choice" continuances. He cites the time period of February 11, 2015, to March 18, 2015. However, on February 11, 2015, Amato entered his appearance for defendant, and the public defender was given leave to withdraw. Defendant also cites the period of March 25, 2015, to April 7, 2015, but the order of March 25, 2015, stated that the continuance was by agreement. Accordingly, the trial court's determination that these periods were attributable to defendant was not an abuse of discretion.

¶ 78    Defendant further cites August 5, 2015, to August 24, 2015, but that order indicates that the continuance was on defendant's motion. At the August 5 hearing, defense counsel stated that he was "in the process of filing motions and set[ting] a hearing." Defendant next points to August 24, 2015, but at that hearing, his counsel said "We can put on my motion to the 31st, then," and the order indicates that the continuance was on defendant's motion. Defendant cites November 23, 2015, to December 10, 2015, but the order states that it was by agreement.

¶ 79    Defendant cites to December 15, 2016, to December 29, 2016, but the trial court found that the case was continued because defendant's attorney had been elected State's attorney. The order states that the continuance was by agreement. Defendant cites December 29, 2016, to February 3, 2017, but the trial court found that this continuance was by agreement. The December 29, 2016, transcript also shows that defense counsel stated that his next available date was February 3, 2017. Last, defendant cites April 7, 2017, to May 12, 2017. The trial court stated that the order for April 7, 2017, appeared to have a pre-marked check mark that the case was continued by the defendant, but the transcript indicated that the case was continued by agreement to May 12, 2017. The trial court's finding regarding these periods were not an abuse of discretion.

¶ 80    Defendant next lists a series of dates that he argues are attributable to the State based on the State's unavailability and unpreparedness. Half of the dates are identical to time periods discussed above, so we do not address them further. Defendant additionally cites December 6, 2016, to December 15, 2016, but the order indicates that the continuance was by agreement. Moreover, at the December 6, 2015, hearing, the State stated that a special prosecutor was needed because defendant's prior attorney had been elected State's Attorney. Defendant also cites February 3, 2017, to April 7, 2017, but that order also indicates that the continuance was by agreement.

¶ 81    We emphasize that defendant was represented by counsel at these hearings who could have immediately objected on the record to any of continuances or to the orders stating that the continuances were by agreement or on defendant's motion, but he did not do so. We further note that during the time period defendant cites he filed numerous motions to suppress evidence, repetitive motions to dismiss the case, a motion to substitute judges, and motions to reconsider, which all had to be addressed before trial. See *Myers*, 352 Ill. App. 3d at 688. Based on the record, we cannot say that the trial court erred in its findings regarding to whom continuances were attributable, nor do we conclude that defendant has shown that his statutory right to a speedy trial was violated.

¶ 82    Defendant additionally argues that his constitutional right to a speedy trial was violated. Though section 103-5 implements the constitutional right to a speedy trial, the constitutional and statutory rights are not necessarily coextensive. *Janusz*, 2020 IL App (2d) 190017, ¶¶ 59-61. The constitutional speedy-trial provisions do not contain a specific time limit within which a defendant must be tried. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Rather, to determine whether a constitutional speedy-trial violation has occurred, four factors are considered as part of

a balancing analysis: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of the speedy-trial right, and (4) prejudice to the defendant caused by the delay. *Barker v. Wingo,* 407 U.S. 514, 530 (1972); *People v. Crane,* 195 Ill.2d 42, 46-48 (2001).

¶ 83    The State argues that defendant has forfeited his constitutional speedy trial argument. We agree. Although defendant has set forth the four factors in his brief, he does not discuss how they specifically apply to this case, most notably the fourth factor. Accordingly, he has forfeited this issue for review. See *Bailey*, 2019 IL App (3d) 180396, ¶ 22. We recognize that defendant's argument is *pro se*, but "where a defendant elects to proceed *pro se,* he is responsible for his representation and is held to the same standards as any attorney." *People v. Richardson*, 2011 IL App (4th) 100358, ¶ 12.

¶ 84                          III. CONCLUSION

¶ 85    For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 86    Affirmed.